[No. S002243. Oct. 31, 1988.]

COUNTY OF SAN MATEO, Plaintiff and Respondent, v.
DELL J., SR., et al., Defendants and Appellants.

**1238**

**COUNSEL**

James J. Hartford for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Ann K.

Jensen and Mary A. Roth, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

EAGLESON, J.—Do principles of equal protection announced by this court in *In re Jerald C.* (1984) 36 Cal.3d 1 [201 Cal.Rptr. 342, 678 P.2d 917] prohibit a county from seeking reimbursement from the parents of a minor child of an Aid to Families With Dependent Children-Foster Care (AFDC-FC) grant used to support the minor who, pursuant to Welfare and Institutions Code section 602,[1] was declared a ward of the juvenile court and placed in a foster care group home?

We hold that the county's statutory entitlement, under both state and federal law, to reimbursement from the family of such a minor for AFDC-FC funds expended for his support and maintenance in a foster care facility—exclusive of any costs attributable to confinement, rehabilitation, treatment or supervision—does not violate equal protection.

### PROCEDURAL BACKGROUND

The minor, Dell J., Jr., who has a history of emotional disturbance, was initially referred to the juvenile court by the County of San Mateo (hereafter county or respondent) Child Protective Services because of an incident involving the sexual abuse of a sibling. He subsequently committed a violation of Vehicle Code section 10852 (vehicle tampering) which led to his being declared a ward of the court pursuant to section 602 on July 29, 1982. He was removed from the family home and placed in a nonsecure foster care group home facility. In August 1982, the probation department obtained an AFDC-FC grant from the county for support of the minor. The county then commenced this action against the minor's parents for child support and reimbursement, pursuant to section 11350, which section mandates compulsory reimbursement from the minor's family for AFDC-FC funds paid to a foster care facility on the minor's behalf.[2]

---

[1] Unless otherwise indicated, all section references are to the Welfare and Institutions Code.

[2] Section 11350 provides in pertinent part: "In any case of separation . . . of a parent or parents from a child . . . which results in aid under this chapter [Chapter 2] being granted to such family, the noncustodial parent or parents shall be obligated to the county for an amount equal to: . . . [¶] (b) The amount of aid paid to the family during such period of separation . . . limited by such parent's reasonable ability to pay during that period in which aid was granted; . . . [¶] The district attorney shall take appropriate action pursuant to this section in the superior court of the county which provided aid under this chapter. . . ."

The probation officer in charge of the minor's placement testified that his commitment "was related to the home situation," and that treatment was one of the primary purposes for his placement in the foster care group home. Although the protection of society is also an element of such a commitment, it was not the "primary reason" for the minor's removal and placement in this case.

The minor was first placed in the Children's Home of Stockton, a private foster care facility, from August 1982 through December 1983. Children are housed therein two to a room. Generally speaking they are not permitted to leave the grounds without permission, although the staff is not allowed to lock the children in. The facility has no fences, locked doors, or guards, and is not locked down at night. Therapists are available to treat the children, and there is an on-grounds school. Children may also be authorized to attend outside public schools.

In January 1984, the minor was transferred to the EE Foster Residential Group Home in San Jose. That facility consists of five private residential homes, each having beds for six children, each with one full-time and one part-time counselor. It accepts section 300 (dependent/neglected) children as well as section 602 wards; all are evaluated and treated identically with respect to supervision, treatment and rehabilitation. The children are allowed out into the community depending upon their individual privileges. Although the group home environment is more "structured" than the ordinary family home, "rehabilitation" may include counseling, entertainment, and field trips to sporting events or concerts. Like the Children's Home of Stockton, there are no guards and the facility is unlocked. While at the EE Foster Home the minor attended outside public school.

It was established that during the minor's placement at the Children's Home of Stockton, payment of AFDC-FC funds was made directly to the facility at the rate of $1,579 per month. During his stay at the EE Residential Group Home, payment was made to that facility at the rate of approximately $1,855 per month.

The executive director of the EE Residential Group Home testified that the aggregate monthly support and maintenance costs (food, clothing, shelter, transportation) per child ranged from $350 to $600, depending upon the age-group of the child. The average monthly component cost of food per child was $75. A "very conservative" estimate of the monthly cost of

The term "paid to the family" as used therein has been interpreted to mean "paid on behalf of the family" in cases, such as this, where the AFDC funds were paid directly to a private institution or boarding home where defendants' child resided at the pertinent times. (*County of San Mateo* v. *Booth* (1982) 135 Cal.App.3d 388, 396-398 [185 Cal.Rptr. 349].)

clothing for each child was $18. Similar expenses were incurred for these items at the Children's Home of Stockton facility.[3]

Evidence was also taken regarding the parents' financial ability to reimburse the county. It was determined that during all relevant periods appellants were living together and capable of providing the minor with a home but for the involuntary placement. They have two other children who were living at home. Dell J., Sr., the minor's father, is a union machinist who earned an average gross monthly income of $2,055. Sara J., the minor's mother, was a graduate student and worked one day a week, grossing approximately $400 per month.

During the nonjury trial, the court requested submission of further written points and authorities on the controlling statutes and case law. Although the county's complaint prayed for, inter alia, reimbursement of the entire amount of the AFDC-FC grant, at the close of its case-in-chief, the county took the position that if the court were to find that *Jerald C.* proscribed reimbursement of that portion of the funds covering costs attributable to confinement, treatment or rehabilitation, then a support order of $225 per month would be "reasonable" in light of all the evidence theretofore presented.[4]

On November 19, 1984, the superior court rendered its proposed decision awarding judgment to the county for $2,511 in arrearages (based upon a monthly reimbursement rate of $93—calculated to include *only* the average monthly cost of the minor's food ($75) and clothing ($18)), and $93 per month current support as long as the child continued in his current placement. The county's request for a wage assignment was denied without prejudice. Commencing November 1, 1984, appellants were ordered to pay the sum of $125 per month ($93 current support plus $32 toward arrearages). A settled statement of decision was filed on April 22, 1985; judgment was thereafter entered on June 5, 1985. This appeal followed.

■■■ In reversing, the Court of Appeal relied on our lead opinion in *Jerald C.*[5] to hold it a violation of equal protection to require reimburse-

---

[3] The director of the EE Residential Group Home, a former 30-year veteran supervisor of the Santa Clara County Juvenile Probation Department, had previously served on the budget board of the Bay Area Placement Committee which set the rates that contracting private foster care facilities could charge the counties (prior to the state's undertaking of that function in Jan. 1983). In that capacity he had occasion to review the budget of the Children's Home of Stockton.

[4] Thus, the county ultimately requested a judgment in the aggregate amount of $6,075 for the period from August 1982 through October 1984, and a continuing child support order of $225 per month commencing November 1, 1984.

[5] As most have recognized, the *Jerald C.* opinion, from the standpoint of form, was an anomaly; the "lead" opinion by Justice Broussard having garnered only three votes, while the

ment from the parents for AFDC-FC funds used to support their minor child who is declared a ward of the court pursuant to section 602 for commission of criminal acts and involuntarily removed from the family home. The court reasoned that among the obvious objectives served by such involuntary placement was the protection of society from possible future criminal acts by the minor, as well as protection of his family. Mistakenly relying on the lead opinion in *Jerald C.* for the proposition that it is the purpose and derivation of the commitment, not the source of funds used to pay for it, which is dispositive in an equal protection analysis, the Court of Appeal concluded that the cost of maintaining a section 602 ward outside the family home for the benefit of society could not arbitrarily be charged to one class of society, e.g., his parents.

## I

In order to meaningfully address the equal protection issue presented here, it is necessary to first review in some detail the controlling federal and state laws and policies governing the AFDC benefit program under which the county was seeking reimbursement.

### Federal Law

AFDC is an elective federal grant-in-aid program under title IV of the Social Security Act (42 U.S.C. § 601 et seq.) through which states with approved plans receive federal funds in order to provide aid and services to needy families with dependent children. (*King* v. *Smith* (1968) 392 U.S. 309, 325 [20 L.Ed.2d 1118, 1130, 88 S.Ct. 2128]; *Garcia* v. *Swoap* (1976) 63 Cal.App.3d 903, 909-910 [134 Cal.Rptr. 137].) The program has been characterized as an exercise in " 'cooperative federalism. . . .' " (*Mitchell* v. *Swoap* (1973) 35 Cal.App.3d 879, 883 [113 Cal.Rptr. 75].)

Under the AFDC program "federal funds [are made] available to those states which have submitted and had approved by the Department of Health, Education and Welfare . . . a plan for aid and services to needy families with children. Although the AFDC program is elective, once a state chooses to join, its plan must comply with the mandatory requirements established by the [Social Security] Act, as interpreted and implemented by regulations promulgated by [the Department of Health, Education and Welfare]. (See also *King* v. *Smith, supra,* 392 U.S. 309, 316-317 [20 L.Ed.2d 1118, 1125-1126].)" (*County of Alameda* v. *Carleson* (1971) 5

"concurring" opinion by Justice Kaus garnered a majority of four votes. The Court of Appeal below, in relying on our "lead" opinion in *Jerald C.,* erroneously invoked the rationale of the *minority* view in that case. The dissent, by adopting the opinion of the Court of Appeal, is likewise flawed.

Cal.3d 730, 738-739 [97 Cal.Rptr. 385, 488 P.2d 953].) The plan must be in effect statewide and must be administered by a single state agency. (42 U.S.C. § 602(a).) Reports must be submitted periodically to the Secretary of Health and Human Services for verification of compliance. (*Ibid.*)

One of the requirements for participation in the AFDC program is that the state have in effect a state plan for foster care assistance. (42 U.S.C. § 602(a)(20).) AFDC-FC payments can be made on behalf of a qualifying child placed outside of the family home, whether that placement be pursuant to voluntary agreement entered into by the child's parent(s), or "as a result of a judicial determination to the effect that continuation [in the family home] would be contrary to the welfare of such child" (e.g., a declaration of wardship under Welf. & Inst. Code, § 602). (42 U.S.C. § 608(a).) In the latter category, the statute appears to make no distinction as to the legal grounds underlying the court order removing the child from the family home.

In 1980, the statutory definition of the type of "child care institution" to which AFDC-FC payments could be made on behalf of a qualifying child was expanded to include public child care institutions which accommodate up to 25 children. (42 U.S.C. § 608; see Pub.L. No. 96-272, § 101(a)(5)(A).) Expressly *excluded* from the definition of "foster family home" are "detention facilities, forestry camps, training schools, or any other facility operated primarily for the detention of children who are determined to be delinquent." (42 U.S.C. § 608.)

The elements of the state plan for foster care maintenance payments required for AFDC-FC program eligibility under 42 United States Code section 602(a)(20) are specifically described in 42 United States Code section 671 et seq. The statutory definition of "foster care maintenance payments" is: "payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation. In the case of institutional care, such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence." (42 U.S.C. § 675(4)(A).) As mandated by 42 United States Code section 608, no amounts are authorized for administrative costs of confinement, rehabilitation, treatment or supervision (other than those "administrative" costs deemed incidental to providing the enumerated support and maintenance items). Foster care maintenance payments must be provided to any needy child who would qualify under 42 United States Code section 606(a) but for his removal from the family home and placement in a qualifying foster care facility, whether due to voluntary placement

or as the result of a judicial determination that removal was required. (42 U.S.C. § 672(a).)

Lastly, part D of subchapter IV (42 U.S.C. § 651 et seq.) requires the state to seek reimbursement of child support from the parents in order to remain eligible for participation in the federally funded AFDC program. Parent recipients of AFDC are required to assign to the state as a condition of receiving benefits any rights to support which they or their children may have. (42 U.S.C. § 602(a)(26)(A).) Collection *must* be pursued in the case of any child with respect to whom such an assignment of rights to child support is effective, *including assignments with respect to children on whose behalf a state agency is making foster care maintenance payments,* to secure support from any person who is legally liable. (42 U.S.C. § 654(4)(B).) The state plan *must* provide for "cooperative arrangements with appropriate courts and law enforcement officials" to assist the state agency administering the plan "in order to ensure optimum results under such program." (42 U.S.C. § 654(7).) The support rights assigned to the state by the responsible relative on behalf of a child receiving AFDC-FC maintenance payments are a legal obligation owed to the state by that person, collectible under all applicable state and local laws. (42 U.S.C. § 656(a)(1).)

To summarize then, where a state fails to seek reimbursement from a minor's parents for federally funded AFDC-FC maintenance payments expended to support the child who is removed from the home, voluntarily or involuntarily by court order, and placed in a nondetention foster care facility, it may stand in violation of federal law, and thereby subject itself to a percentage penalty reduction or loss of its AFDC program eligibility and funding altogether. (See 42 U.S.C. §§ 603, 671(b).)

*State Law*

California has elected to participate in the AFDC program. (§ 11200 et seq.) Under existing California law, the Department of Social Services administers the program "to secure full compliance with the applicable provisions of state and federal laws" (§ 10600), and is charged with establishing regulations not in conflict with federal law (§ 10604, subd. (b)). (See *County of Alameda* v. *Carleson, supra,* 5 Cal.3d 730, 739.)[6] The federally approved state plan under which AFDC is administered in this state contains, among other elements, a child support program. (See 42 U.S.C. §§ 601, 602(a)(27), 654.)

In an effort to comply with both the letter and spirit of the federal legislation, "[t]he Legislature has explicitly declared that the AFDC law

---

[6] The Legislature has declared its intent that all federal-state welfare programs are to be administered in this state pursuant to federal as well as state law. (§ 10000.)

'shall be administered in such a way that needy children and their parents will be encouraged . . . to assist in their own maintenance.' (§ 11205, third par.) [fn. omitted.] The law itself provides that AFDC shall be granted for the support of a child who is in need 'due to . . . [t]he divorce, separation or desertion of a parent . . . and resultant continued absence of a parent from the home . . . .' (§ 11250, subd. (b).) It also provides that aid shall be granted to such child who has been 'placed in foster care.' (§ 11251, subd. (b).) For purposes of the AFDC law, ' "foster care" means care in a foster home, group home, or institution.' (§ 11450, subd. (c), as added by Stats. 1972, ch. 1406, § 31.7, pp. 2983-2984; see *id.*, as amended by Stats. 1980, ch. 1166, § 22.1, pp. 3927-3928; see also § 11402 [relative to 'boarding homes'].)" (*County of San Mateo* v. *Booth, supra,* 135 Cal.App.3d at p. 397.)

The state statutory scheme provides that eligibility for AFDC-FC funds shall be extended to children removed from the family home, inter alia, "as a result of a judicial determination that continuance in the home would be contrary to the child's welfare . . . ." (§ 11401, subd. (b).) It is expressly provided that "any of the following apply: (A) The child has been adjudged a dependent child of the court on the grounds that he or she is a person described by Section 300 [dependent/neglected children]. [¶] (B) *The child has been adjudged a ward of the court on the grounds that he or she is a person described by sections 601 and 602.*" (§ 11401, subd. (b)(1)(A) and (B), italics added.)

Qualified foster care facilities to which AFDC-FC support payments may be made on behalf of qualified minors are further defined to ensure compliance. (§ 11400.) A qualifying foster care "group home" is defined as: "a *nondetention* privately operated residential home of any capacity that provides services in a group setting to children in need of care and supervision, as required by paragraph (1) of subdivision (a) of Section 1502 of the Health and Safety Code." (§ 11400, subd. (g), italics added.)

Section 11462 authorizes the Department of Social Services to establish a rate schedule of "allowable costs" at qualifying foster care facilities for which AFDC-FC funds may be expended on behalf of children placed therein. With one exception, "allowable costs" under the state plan are identical to "foster care maintenance payments" as defined in 42 United States Code section 675(4)(A), i.e., the reasonable cost of, and cost of providing, food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and the reasonable costs of administration and operation necessary to provide these support and maintenance items. Also included as an allowable cost under the state plan is the cost of "reasonable activities performed by social workers employed by

group home providers which are not otherwise allowable as daily supervision or as the costs of administration."

Section 11350 (see fn. 2, *ante,* pp. 1239-1240), under which the instant action was brought, provides that the noncustodial parent or parents shall be obligated to the county[7] for an amount equal to the aid paid to the family, or to a qualifying foster care facility, on behalf of the child. In this state receipt of AFDC funds operates as an assignment of parental support rights by operation of law. (§ 11477, subd. (a).)

"In the context established by these provisions, section 11350 represents a legislative pronouncement of public policy that a separated or deserted parent of a needy child who has been placed in foster care shall be 'obligated' to reimburse a county for AFDC payments made to the 'institution' or 'boarding home' involved if the parent had the 'reasonable ability to pay during that period in which aid was granted.' [fn. omitted.] It has been held in broader terms that the policy is 'to insure that the moneys disbursed by the county for the aid of a needy child be returned to the public source from which they were disbursed.' (*In re Marriage of Shore* (1977) 71 Cal.App.3d 290, 298 [139 Cal.Rptr. 349]; see *County of Santa Clara* v. *Support, Inc.* (1979) 89 Cal.App.3d 687, 697 [152 Cal.Rptr. 754].)" (*County of San Mateo* v. *Booth, supra,* 135 Cal.App.3d at p. 398.)

In short, California's federally approved plan under which AFDC is administered is designed to ensure strict compliance with the federal legislation. Under state law, the County of San Mateo, in seeking a child support order, was obligated to seek reimbursement from appellants of the state AFDC-FC funds expended for the minor's support during his placement pursuant to court order in a foster care group home. Such reimbursement was "assigned" to the county by operation of law, subject to reduction according to appellants' ability to pay.

## II

■ Notwithstanding the principles outlined above, it is of course fundamental that " 'Congress is without power to enlist state cooperation in a joint federal-state program by legislation which authorizes the States to violate the Equal Protection Clause.' " (*Townsend* v. *Swank* (1971) 404 U.S. 282, 291 [30 L.Ed.2d 448, 456, 92 S.Ct. 502]; quoting *Shapiro* v. *Thompson* (1969) 394 U.S. 618, 641 [22 L.Ed.2d 600, 619, 89 S.Ct. 1322].) With this basic tenet in mind, we turn to the merits of appellants' equal protection argument.

---

[7] A California county is a legal subdivision of the state. (Gov. Code, § 23002.)

In 1982, this court decided *In re Jerald C.* (Cal.) (superseded opn.) wherein we invalidated former section 903,[8] holding it a denial of equal protection to impose the cost of incarceration, including the costs of care, support and maintenance, on the parents of a child declared a ward of the court pursuant to section 602. We thereafter granted a rehearing, but before our new decision was filed, the 1983 Legislature rewrote section 903.[9] While still providing for reimbursement of the support costs of minors placed outside the family home, the section as amended specifically excluded any charges related to "incarceration, treatment, or supervision for the protection of society and the minor and the rehabilitation of the minor." (§ 903.)

In 1984 we filed a new opinion in *Jerald C.* (*In re Jerald C., supra,* 36 Cal.3d 1.) *Jerald C.* involved an action by the county pursuant to former section 903 seeking direct reimbursement from the father of a minor for the

---

[8] Section 903 as then in effect provided: "The father, mother, spouse, or other person liable for the support of a minor person, the estates of such persons, and the estate of such minor person, shall be liable for the cost of his care, support, and maintenance in any county institution in which he is placed, detained or committed pursuant to the order of the juvenile court, or for the cost to the county in which the juvenile court making the order is located, of his care, support, and maintenance in any other place in which he is placed, detained, or committed pursuant to the order of the juvenile court. The liability of such persons (in this article called relatives) and estates shall be a joint and several liability."

[9] Section 903 as amended (Stats. 1983, ch. 1135, §§ 2-3, p. 4307) provided: "A parent of a minor, the estate of a parent, and the estate of the minor, shall be liable for the reasonable costs of support of the minor while the minor is placed, or detained in, or committed to, any institution or other place pursuant to order of the juvenile court. The liability of these persons and estates shall be a joint and several liability. [¶] *It shall be the responsibility of a county to demonstrate to any person against whom it seeks to enforce the liability established by this section, that the charges it seeks to impose are limited to the reasonable costs of support of the minor and that these charges exclude any costs of incarceration, treatment, or supervision for the protection of society and the minor and the rehabilitation of the minor. The county shall separately itemize the cost of each major component, such as food, clothing and medical expense, contained within the costs of support of the minor, for any person against whom the county seeks to impose liability under this section.* [¶] As used in this section, 'costs of support' means that portion of the costs incurred by the county in maintaining a minor that are equivalent to the reasonable expenditures required of a parent pursuant to Sections 196, 207, and 208 of the Civil Code, and does not include the expenses of incarceration, treatment, or supervision imposed for the protection of society and the minor and his or her rehabilitation." (Italics added.)

The Legislature also amended section 202 (Stats. 1983, ch. 543, § 8, pp. 2353-2356), which defines the purpose and construction of the juvenile court law, by, inter alia, adding subdivision (c) thereto, which provided: "It is also the purpose of this chapter to reaffirm that the duty of a parent to support and maintain a minor child continues, subject to the financial responsibility of the parent to pay, during any period the minor may be declared a dependent or ward of the court and removed from the custody of the parent." (The term "financial responsibility" was thereafter corrected to read "financial ability," see Stats. 1983, ch. 1135, § 1, p. 4306.)

Adopted as an urgency measure, these amendments took effect immediately upon filing (§ 202 on July 28, 1983; § 903 on Sept. 28, 1983), well over a year prior to trial and entry of judgment in the instant case.

cost to the county of maintaining the minor at juvenile hall, boys ranch and ultimately the California Youth Authority, the minor having been made a ward of the juvenile court pursuant to section 602. Thus, unlike the instant case, where the minor was removed from the family home pursuant to a section 602 declaration of wardship but placed in a *nonsecure* foster care group home, the minor's commitment to secure facilities (e.g., the California Youth Authority) in *Jerald C.* was indisputably for the purpose of confinement for the protection of society.

In reversing the reimbursement order, the lead opinion in *Jerald C.,* signed by three Justices, commenced its analysis by acknowledging that "[s]tatutes requiring responsible relatives to reimburse governmental agencies for support have been sustained against claims of denial of equal protection." (36 Cal.3d at p. 5; citing *Swoap* v. *Superior Court* (1973) 10 Cal.3d 490, 502-507 [111 Cal.Rptr. 136, 516 P.2d 840] [adult child must reimburse for aid furnished to needy or poor parent]; and *In re Ricky H.* (1970) 2 Cal.3d 513, 518-521 [86 Cal.Rptr. 76, 468 P.2d 204] [parent must reimburse cost of counsel provided child in juvenile proceeding]; see also *In re Dudley* (1966) 239 Cal.App.2d 401, 404-412 [48 Cal.Rptr. 790] [parent must reimburse for commitment of mentally deficient child]; *County of Alameda* v. *Kaiser* (1965) 238 Cal.App.2d 815, 817-818 [48 Cal.Rptr. 343] [parent must reimburse hospital costs of child].)

The lead opinion went on to reason, however, that "relative responsibility statutes have been invalidated when the government charges were not for support which the relative refused or failed to provide but for the cost of maintaining public institutions for public benefit. [¶] 'A statute obviously violates the equal protection clause if it selects one particular class of persons for a species of taxation and no rational basis supports such classification. [Citations.] Such a concept for the state's taking of a free man's property manifestly denies him equal protection of the law.' (*Dept. of Mental Hygiene* v. *Kirchner* (1964) 60 Cal.2d 716, 722-723 [36 Cal.Rptr. 488, 388 P.2d 720, 20 A.L.R.3d 353] [remanded 380 U.S. 194 (43 L.Ed.2d 753, 85 S.Ct. 87); sub. opn. 62 Cal.2d 586 (43 Cal.Rptr. 329, 400 P.2d 321, 20 A.L.R.3d 361)]; [additional citations omitted].) . . . To charge the cost of operation of state functions conducted for public benefit to one class of society is arbitrary and violates the basic constitutional guarantee of equal protection of the law. [Citation.] [¶] . . . The cases have reasoned that when incarceration or commitment is for the protection of society, it is arbitrary to assess relatives for the expense. (*Dept. of Mental Hygiene* v. *Kirchner, supra,* 60 Cal.2d 716, 719-720; *Department of Mental Hygiene* v. *Hawley* (1963) 59 Cal.2d 247, 251 et seq. [28 Cal.Rptr. 718, 379 P.2d 22]; *Department of Mental Hygiene* v. *Bank of America* (1970) 3 Cal.App.3d 949, 950 et seq. [83 Cal.Rptr. 559].)" (*In re Jerald C., supra,* 36 Cal.3d at p. 6.)

Central to the lead opinion's analysis was the fact that "[t]he basis of commitment under section 602 is criminal conduct." (36 Cal.3d at p. 7.) Several of the stated purposes of a section 602 commitment as declared in section 202 were emphasized, among them being: "(a) . . . to protect the public from criminal conduct by minors; . . . removing [a minor] from the custody of his parents only when necessary for his welfare or for the safety and protection of the public; . . . [¶] (b) . . . the protection of the public from the consequences of criminal activity. . . ." (§ 202, subds. (a) and (b); *In re Jerald C., supra,* 36 Cal.3d at pp. 7-8.) The court reasoned that "[w]hatever the basis for other commitments by the juvenile court (see §§ 300, 601), the purposes of the confinement and treatment in commitments pursuant to section 602 include 'the protection of society from the confined person.' (*Dept. of Mental Hygiene* v. *Kirchner, supra,* 60 Cal.2d at p. 720.)" (36 Cal.3d at p. 7.)

Finally, heavy reliance was placed on the holding of *Kirchner,* in particular the following passage twice quoted in the lead opinion: " '[T]he purposes of confinement and treatment or care . . . encompass the protection of society from the confined person, and his own protection and possible reclamation as a productive member of the body politic. Hence the cost of maintaining the state institution, *including provision of adequate care for its inmates,* cannot be arbitrarily charged to one class in the society; such assessment violates the equal protection clause.' ([*Kirchner, supra,*] 60 Cal.2d at p. 720.)" (*In re Jerald C., supra,* 36 Cal.3d at pp. 7-8, italics added.)

The lead opinion therefore rejected the concept of allocating "in a reasonable manner a portion of the [support and maintenance] costs to each juvenile . . . ." (36 Cal.3d at p. 10.) It held that the county may recover neither "the costs of confinement and treatment" nor the "costs incurred in supporting and maintaining the juvenile based on the parental common law duty [to support minor children] and cases upholding responsible relative statutes in other situations." (*Ibid.*)

 The concurring opinion in *Jerald C.,* signed by four Justices (hereafter referred to as the "majority" opinion), characterized the lead opinion as being painted with "too broad a brush." (36 Cal.3d at p. 11, opn. by Kaus, J.) Writing for a majority of the court, Justice Kaus explained: "[I]t is undeniable that equal protection principles do not permit us to saddle a tiny segment of the public with the cost of protecting society from persons who, for one reason or another, must be confined in institutions. Yet if such a person has someone who is legally responsible for supporting him with the necessaries of life—food, clothing, shelter—I see no reason why the state cannot charge the responsible party for whatever he saves by not having to

support the person 'on the outside.' " (*Ibid.*) Although leaving open the possibility of constitutional proration of charges between permissible (support and maintenance) and impermissible (confinement, treatment, rehabilitation) costs, the majority opinion concluded that "[t]he statutes [e.g., former sections 202 and 903] in force at the time the [reimbursement] order before us was entered are inefficient tools for such fine tuning." (*Id.*, at p. 12.)[10]

■ In accord with the majority view in *Jerald C.*, we here reaffirm that a county may seek reimbursement from the parents of a minor child, who is declared a ward of the court pursuant to section 602, for the reasonable costs expended for the support and maintenance of the minor while placed outside the family home. As this case amply demonstrates, it oversimplifies the matter to conclude that the purpose and derivation of the commitment alone is controlling and dispositive in an equal protection analysis.

As we have explained, the lead opinion in *Jerald C.* placed considerable emphasis on a well-worn quotation from *Dept. of Mental Hygiene* v. *Kir-*

---

[10] Because the 1983 amendments to sections 202 and 903 (*ante,* at p. 1247, fn. 9) were not yet in effect to govern *Jerald C.,* the majority opinion "express[ed] no view whether the 1983 legislation . . . meets constitutional standards." (36 Cal.3d at pp. 12, fn. 1, 14, fn. 5, opn. by Kaus, J.)

The 1984 Legislature amended section 903 yet again in an effort to bring the provisions of that section closer in line with the requirements set out in our *Jerald C.* majority opinion. (Stats. 1984, ch. 485, § 1, pp. 1989-1990.) The 1984 amendments to the section provide, in pertinent part: "(b) It shall be the responsibility of a county to demonstrate to any person against whom it seeks to enforce the liability established by this section, that the charges it seeks to impose are limited to the reasonable costs of support of the minor and that these charges exclude any costs of incarceration, treatment, or supervision for the protection of society and the minor and the rehabilitation of the minor. *Except in those placements of a minor in which an AFDC-FC grant is made,* the county shall separately itemize the cost of each major component, such as food, clothing, and medical expense, contained within the costs of support of the minor, for any person against whom the county seeks to impose liability under this section. *An AFDC-FC grant shall be considered a separate, indivisible component item of the cost of support of a minor. Nothing in this section shall preclude the district attorney from seeking reimbursement of AFDC-FC costs pursuant to Section 11350.* [¶] (c) It is the intent of the Legislature in enacting this subdivision to protect the fiscal integrity of the county, to protect persons against whom the county seeks to impose liability from excessive charges, to insure reasonable uniformity throughout the state in the level of liability being imposed, and to insure that liability is imposed only on persons with the ability to pay. In evaluating a family's financial ability to pay under this section, the county shall take into consideration the family income, the necessary obligations of the family, and the number of persons dependent upon this income. *Except in those placements of a minor in which an AFDC-FC grant is made,* and [subject to several other limited exceptions] . . . 'costs of support' as used in this section means only actual costs incurred by the county for food and food preparation, clothing, personal supplies, and medical expenses, not to exceed a combined maximum cost of fifteen dollars ($15) per day . . . ." (Italics added.)

These amendments took effect on January 1, 1985, after the trial in this case, but prior to the filing of the statement of decision and entry of judgment in favor of the county.

*chner, supra,* 60 Cal.2d 716. The passage from *Kirchner* bears repeating here, for its inclusion of basic support costs in those nonreimbursable costs of maintaining a state institution for the benefit of society has been a source of considerable confusion.[11] The passage reads: "[T]he purposes of confinement and treatment or care . . . encompass the protection of society from the confined person, and his own protection and possible reclamation as a productive member of the body politic. Hence the cost of maintaining the state institution, *including provision of adequate care for its inmates,* cannot be arbitrarily charged to one class in the society; such assessment violates the equal protection clause." (*Kirchner,* 60 Cal.2d at p. 720, italics added.)

*Kirchner* held it a violation of equal protection for the state to attempt to recover, from the estate of the daughter of a mentally ill person under commitment to a state mental institution, the costs of care, support, and maintenance of the patient while incarcerated at the institution. The *Kirchner* court commenced its analysis by observing that the common law placed no duty or liability upon children to support their parents. (60 Cal.2d at p. 718, fn. 4.) Crucial to the holding was the fact that the statute which placed liabilty upon the servient relative made no provision for taking into account the institutionalized parent's own resources and ability to support herself.

As aptly pointed out in *In re Dudley, supra,* 239 Cal.App.2d 401, "*Kirchner* does not expressly say that a person otherwise liable for the support of an incompetent is denied equal protection of the law because the state requires him to contribute to the support and maintenance of the dependent while he is receiving treatment from the state. In fact, *Kirchner* recognizes the liability of the inmate or patient and his estate for his care by emphasizing the language from *Hawley* [*Department of Mental Hygiene* v. *Hawley, supra,* 59 Cal.2d 247] so stating. (60 Cal.2d at p. 720 [further citations omitted].) Furthermore, from the [*Kirchner*] opinion's analysis of *Guardianship of Thrasher* (1951) 105 Cal.App.2d 768 [234 P.2d 230], and *Estate of Risse* (1957) 156 Cal.App.2d 412 [319 P.2d 789], . . . it may be inferred that it is not a denial of equal protection of the law to provide for payments by a spouse who is otherwise liable for the support of the patient. (Citations.) *Similar considerations indicate that it is not unconstitutional to seek repayment from a parent who is otherwise obligated to support a minor child.* (Citations.)" (239 Cal.App.2d at pp. 408-409, italics added.)

---

[11] The *Kirchner* court's failure to draw any distinction between a responsible relative's preexisting legal obligation to furnish a dependent's basic support costs, and the unconstitutional "arbitrary" assessment of the general costs of maintaining state institutions for the public benefit against such class of persons—has drawn its share of criticism. (See *In re Dudley, supra,* 239 Cal.App.2d 401, 407, fn. 8 [citing six contemporary law review commentaries critical of the breadth of the *Kirchner* holding], 407-412, *passim.*)

In short, "the [*Kirchner*] court rejected the attempt to shift the cost of the maintenance of the patient from the state and the patient's estate to a relative *who except for the arbitrary statute was in no other manner liable for the support of the patient*." (*In re Dudley, supra,* 239 Cal.App.2d at p. 412, italics added.) *Kirchner* cannot logically be read to hold that in every case where such a preexisting lawful obligation of support exists, any attempt by the state to recover from the responsible relatives the costs of support and maintenance of the dependent is a per se violation of equal protection.

█ We reaffirm the teaching of *Kirchner* and its progeny which explains that fundamental principles of equal protection preclude a statutory scheme for reimbursement of public assistance from requiring a class of responsible relatives (here the parents) to alone bear the costs of confinement, treatment, rehabilitation or supervision of a dependent (here the minor) whose custody is removed from the family, voluntarily or pursuant to court order, in whole or in part for the benefit and protection of society. In contrast, where a preexisting legal obligation of support of the dependent is established, there is no constitutional impediment to the state seeking reimbursement from the responsible family members of the reasonable costs of support and maintenance of such dependent for the duration of his placement outside the family home, where such uniform costs can be identified and segregated out from nonallowable costs, allocated amongst similarly situated dependents in a reasonable manner, and where the responsible relatives' liability is subject to reduction according to their reasonable ability to pay.[12]

### III

"Section 11350 is one of various statutes which require responsible relatives to reimburse the state for support payments. Similar 'responsible relative' legislation has been consistently upheld against equal protection challenges. [Citations.]" (*City and County of San Francisco* v. *Thompson* (1985) 172 Cal.App.3d 652, 657 [218 Cal.Rptr. 445].)

"Relieving the public of the economic burden of support for the impoverished is a legitimate state purpose. (*Swoap* v. *Superior Court, supra,* 10 Cal.3d at p. 506.) Likewise, the state has a legitimate interest in maximizing the benefit payments it can make to all needy children. (See, e.g., *Dandridge* v. *Williams* (1970) 397 U.S. 471, 483-486 [25 L.Ed.2d 491, 500-502, 90 S.Ct. 1153].) . . . . [¶] In seeking recoupment of AFDC benefits from noncustodial parents with the ability to pay the state is acting to enforce parental support duty and to recover welfare money it has spent because the

---

[12]To the extent inconsistent with the principles discussed herein, *County of Marin* v. *Pezok* (1987) 190 Cal.App.3d 1441 [236 Cal.Rptr. 56], and *County of Merced* v. *Dominguez* (1986) 186 Cal.App.3d 1513 [231 Cal.Rptr. 455], are disapproved.

noncustodial parent has not met that support duty [here, by virtue of court ordered out-of-home foster care placement]. Recovered funds can both reduce the outlay of tax monies and ensure that maximum benefit levels are maintained. Section 11350 is a reasonably tailored means by which to achieve these goals." (*City and County of San Francisco* v. *Thompson, supra,* 172 Cal.App.3d at pp. 658-659.)

 Appellants' legal obligation of support—and reimbursement of public assistance expended for the support—of their minor son during his placement, pursuant to court order, in a foster care group home, was clear under section 11350, and the 1983 amendments to sections 202 and 903 in effect prior to the trial, entry of judgment, and date on which the reimbursement payments were ordered to commence in this case.[13] The Court of Appeal thus erred in concluding that the nature of the minor's wardship and commitment in and of itself precluded enforcement of this obligation.[14]

## IV

The county took the position below that because the foster care group homes in which the minor was placed were *nonsecure* facilities, *Jerald C.* was inapposite as there was no cost of incarceration for the protection of society included in the AFDC expenditures for which the county was seeking reimbursement.

The evidence established that both the Children's Home of Stockton and the EE Residential Group Home in which the minor was placed were, generally speaking, "nonsecure" or "nondetention" foster care facilities. The group homes were residential in nature, had no fences or guards, and the children were not locked in—indeed the staffs were not permitted to do so. As has been shown, in order for federal-state AFDC-FC payments to be made on behalf of a committed minor, the facility in which the minor is placed must qualify as a "foster family home" (federal law) or "group home" (state law); expressly excluded are "detention facilities . . . or any

---

[13] Other provisions of law, although not directly applicable herein, also seek to ensure that parents meet their statutory and common law duty to furnish *reasonable* support for their minor children. For example, Penal Code section 270 requires that parents "furnish *necessary* clothing, food, shelter or medical attendance, or other remedial care . . . ." (italics added), and imposes misdemeanor liability for the failure to do so.

[14] Indeed, the Court of Appeal in its opinion below failed to even mention sections 202 and 903, or the Legislature's amendment of those statutes—responsive to the majority holding in *Jerald C.*—by which it expressly "reaffirm[ed] that the duty of a parent to support and maintain a minor child continues, subject to the financial ability of the parent to pay, during any period the minor may be declared a dependent *or ward of the court* and removed from the custody of the parent." (§ 202, subd. (c), italics added.) The dissent, by merely adopting the opinion of the Court of Appeal, likewise disregards the controlling statutes.

other facility operated *primarily* for the detention of children who are determined to be delinquent." (42 U.S.C. § 608, italics added; see § 11400, subd. (g) [defining a qualifying foster care "group home" as "a *nondetention* privately operated residential home . . .," italics added].)

Although the group homes here were not operated "primarily" as secure detention facilities, any court ordered involuntary placement of a child in such a facility clearly involves an element of "detention." As one court has pointed out, "[m]inors are not free to leave such facilities *without permission*; if they do leave without permission they may be housed in a secure facility following their apprehension, pending a detention hearing pursuant to section 632. (§ 636.2.) [Fn. omitted.]" (*County of Merced* v. *Dominguez, supra,* 186 Cal.App.3d at pp. 1517-1518, italics added.)

Moreover, the costs of "treatment . . . [and] supervision for the protection of society and the minor and the rehabilitation of the minor" (§ 903, subd. (b)) are plainly incurred in such facilities, and the Legislature, consistent with principles of equal protection announced in *Jerald C.,* has expressed its clear intent that the county shall bear such costs (as it must bear costs associated with "incarceration"), and shall further have the burden of demonstrating that the charges it seeks to impose are limited to the reasonable costs of support of the minor. (*Ibid.*)

■ We therefore conclude that, irrespective of whether a minor is placed in a "secure" institution or "nondetention" facility such as the foster care group homes in which the minor was here placed, the county must bear the burden of demonstrating that the costs it seeks to impose are limited to the reasonable costs of support, and exclude any costs of incarceration, treatment, or supervision for the protection of society and the minor and the rehabilitation of the minor.

V

We have previously noted that section 903 as amended by the 1983 Legislature, adopted as an urgency measure, became effective September 28, 1983, and applied herein. (*Ante,* at p. 1247, fn. 9.) Those amendments placed upon the county seeking a support order under section 903 "the responsibility . . . to demonstrate to any person against whom it seeks to enforce the liability established by this section, that the charges it seeks to impose are limited to the reasonable costs of support of the minor and that these charges exclude any costs of incarceration, treatment, or supervision for the protection of society and the minor and the rehabilitation of the minor. The county shall separately itemize the cost of each major component, such as food, clothing and medical expense, contained within the costs

of support of the minor, for any person against whom the county seeks to impose liability under this section." (Former § 903, as amended by Stats. 1983, ch. 1135, § 3.)

■■■ The reimbursement order entered in this case indisputably covered only a portion of the actual costs of the minor's support and maintenance at the foster care group homes. No charges were assessed for the costs of confinement, treatment, supervision or rehabilitation, and evidence of appellants' ability to pay reimbursement was introduced and considered in the trial court. We therefore conclude that the order of reimbursement and entry of judgment thereupon was valid.[15]

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Panelli, J., Arguelles, J., and Kaufman, J., concurred.

**BROUSSARD, J.**—I concur in the judgment under the compulsion of the opinion of Justice Kaus in *In re Jerald C.* (1984) 36 Cal.3d 1, 11 [201 Cal.Rptr. 342, 678 P.2d 917]. As the author of the lead opinion in that case, I must recognize that, although labelled by its author as a concurring opinion, Justice Kaus's opinion was a concurring and dissenting opinion in content and that it garnered the support of four justices. Insofar as it agrees with the lead opinion, the lead opinion is a majority opinion, indeed a unanimous opinion, but insofar as Justice Kaus's opinion disagrees or goes beyond the lead opinion, it is the majority view.

Both opinions agreed that the applicable version of Welfare and Institutions Code section 903[1] imposing liability upon parents for the costs of support of juvenile wards in county institutions was invalid. The lead opinion reasoned: A statute is invalid if it selects one particular class of persons for a species of taxation without rational basis. To charge the cost of state functions for public benefit to one class of society is arbitrary, and commitments of children under section 602 are to protect the public from criminal conduct by minors. The charge could not be justified on the basis of the common law duty of parents to reimburse for support codified in section 207 because that duty only applies where the parent neglects to support and

---

[15] Because the reimbursement order in this case was limited to itemized support costs, the order is clearly valid under the 1983 amendments to section 903, and we have no occasion to consider the application or validity of the 1984 amendments to section 903 which, inter alia, provide that "an AFDC-FC grant shall be considered a separate indivisible component item of the cost of support of a minor . . .," and which except AFDC-FC reimbursement orders from the $15 per day limit imposed on other reimbursement orders. (See *ante* at p. 1250, fn. 10.)

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

because section 903 provides for recovery not only of support costs but also of costs relating to confinement. (36 Cal.3d at pp. 6-10.)

This portion of the lead opinion was not challenged by Justice Kaus's opinion; rather, it is the basis for invalidating the statute under both opinions. Accordingly, this portion of the lead opinion is the majority and unanimous opinion of the court. The Court of Appeal and the dissenting opinion in the instant case rely upon this portion of the *Jerald C.* lead opinion, and obviously there is nothing wrong in relying upon the unanimous portion of the lead opinion.

The lead opinion went on to conclude that denying the county any recovery of its expenses did not result in unjust enrichment of the parents, who are denied custody of their child, and that the costs incurred by the county could not properly be allocated between support costs and confinement costs because the purpose of section 602 commitments was not to provide support and maintenance. (36 Cal.3d at pp. 10-11.) Justice Kaus's opinion concluded to the contrary that the Legislature under a proper system of allocation could charge the parents for their savings in not having to support their child, but that the applicable statute could not be construed as an appropriate allocation. (36 Cal.3d at p. 11 et seq.) As to these matters, Justice Kaus's opinion garnered the support of a majority of the justices, and although I continue to adhere to my views expressed in the lead opinion, I am compelled, until a majority of the court rules otherwise, to accept the position of the majority in *Jerald C.* I cannot ignore the majority view in *Jerald C.* as the dissenting and Court of Appeal opinions do.

Justice Kaus, after pointing out that the lead opinion paints "with too broad a brush," stated: "My basic theory is this: it is undeniable that equal protection principles do not permit us to saddle a tiny segment of the public with the cost of protecting society from persons who, for one reason or another, must be confined in institutions. Yet if such a person has someone who is legally responsible for supporting him with the necessaries of life— food, clothing, shelter—I see no reason why the state cannot charge the responsible party for whatever he *saves* by not having to support the person 'on the outside.' The plurality suggests that such a scheme 'would betray a misguided sense of values.' Perhaps so, but it is not for us to make value judgments concerning legislation which passes constitutional muster." (36 Cal.3d at pp. 11-12, italics added and fn. omitted.)

The opinion then goes on to hold that the statute before the court could not be construed to make the proper allocation necessary to uphold it. The opinion also discusses at some length the savings issue, pointing out that incarceration, from a material point of view, may be a step up for the minor

in some cases and that in some the juvenile might be providing for his own support and there would be no savings.

In the instant case, the parents appealed challenging the facial validity of the statutes, relying upon *Jerald C.* The Attorney General countered by arguing that *Jerald C.* did not apply because the foster care group homes in which the minor was placed were nonsecure or nondetention foster care facilities. The majority opinion in part IV, *ante,* pages 1253-1254, ably answers the Attorney General's argument, and we must address the issue of the validity of the statutes under *Jerald C.*

I conclude that the 1983 version of section 903 is valid under Justice Kaus's opinion. In permitting recovery of costs of support, the section provided in part: "As used in this section, 'costs of support' means that portion of the costs incurred by the county in maintaining a minor that are equivalent to the *reasonable expenditures* required of a parent pursuant to Sections 196, 207, and 208 of the Civil Code, and does not include the expenses of *incarceration, treatment,* or *supervision* imposed for the protection of society and the minor and his or her rehabilitation." (Italics added.) In imposing liability, the section also spoke of costs, "such as food, clothing, and medical expense." The limitation to "reasonable expenditures" of a parent should be read to comply with the requirement that the county recovery is limited to parental savings, and the provisions relating to food, clothing and medical expenses coupled with the exclusion of expenses for incarceration, treatment, or supervision should be read to comply with the requirement of proper allocation.

Appellants did not claim that the award of $93 per month exceeded their savings or support obligation or that the evidence did not properly allocate food and clothing costs.

I agree that the judgment of the Court of Appeal should be reversed.

**MOSK, J.**—I dissent.

This is not a case in which parents have refused or failed to support their child in the home environment and for that reason the youngster was removed. This is a case in which the juvenile committed two serious criminal acts: sexual abuse of a sibling, and vehicle tampering in violation of Vehicle Code section 10852. Thus he was declared a ward of the court, removed from his home involuntarily, his custody was awarded to a juvenile probation officer, and he was detained in a regulated environment.

It is evident that the primary motivation of the court in this instance was protection of the public. Under such circumstances the rule of *In re Jerald C.* (1984) 36 Cal.3d 1, is controlling.[1]

I agree with the opinion of the Court of Appeal in this case, written by Justice Newsom and concurred in by Presiding Justice Racanelli and Justice Holmdahl. I therefore adopt that opinion in relevant part, omitting footnotes: Appellants' minor child was declared a ward of the juvenile court on August 11, 1982, pursuant to Welfare and Institutions Code section 602.[2] Custody of the minor child was removed from appellants and he was placed with a juvenile probation officer. The child was not confined to a juvenile detention facility, however; instead, he was placed in the Children's Home of Stockton, and then the EE Residential Group Home, both nonsecure facilities. State aid to families with dependent children (AFDC) funds were used to support the child.

The trial court awarded respondent reimbursement for the costs of care of the child pursuant to section 11350, which mandates compulsory reimbursement from "the family" of AFDC funds paid to a foster care facility. (*County of Ventura* v. *Stark* (1984) 158 Cal.App.3d 1112, 1117 [205 Cal.Rptr. 139]; *County of San Mateo* v. *Booth* (1982) 135 Cal.App.3d 388, 397 [185 Cal.Rptr. 349].) The central issue presented in this appeal is whether collection from appellants of the AFDC funds used to support their minor child would constitute a violation of the equal protection clause under the principles announced by our state high court in *In re Jerald C., supra,* 36 Cal.3d 1 (hereafter *Jerald C.*).

In *Jerald C., supra,* the minor child was declared a ward of the juvenile court pursuant to section 602, placed in custody at juvenile hall, and subsequently committed to the California Youth Authority. (36 Cal.3d at p. 4.) The County of Santa Clara sought reimbursement pursuant to section 903 (prior to its amendment). While acknowledging that "[s]tatutes requiring responsible relatives to reimburse governmental agencies for support have

---

[1] The majority declare in their footnote 5 that the opinions in *Jerald C.* were an anomaly as to form. Whether or not that is an accurate description, the fundamental rule emanating from those opinions has been recognized and followed.

The majority complain that the Court of Appeal did not consider sections 202 and 903 of the Welfare and Institutions Code. They overlook the fact that those sections were in effect in 1984 when this court decided *Jerald C.* The lead opinion in *Jerald C.* discussed both sections and concluded that if broadly interpreted they would offend the rule in *Dept. of Mental Hygiene* v. *Kirchner* (1964) 60 Cal.2d 716 [36 Cal.Rptr. 488, 388 P.2d 720, 20 A.L.R.3d 353]. The opinion signed by other members of the court did not convincingly dispute that conclusion.

[2] Unless otherwise indicated, all section references are to the Welfare and Institutions Code.

been sustained against claims of denial of equal protection" (*id.* at p. 5; citing *Swoap* v. *Superior Court* (1973) 10 Cal.3d 490 [111 Cal.Rptr. 136, 516 P.2d 840], and *In re Ricky H.* (1970) 2 Cal.3d 513 [86 Cal.Rptr. 76, 468 P.2d 204]), the court observed: "However, relative responsibility statutes have been invalidated when the government charges were not for support which the relative refused but for the cost of maintaining public institutions for public benefit . . . . [¶¶] The cases have reasoned that when incarceration or commitment is for the protection of society, it is arbitrary to assess the relatives for the expense." (*Jerald C., supra,* 36 Cal.3d at p. 6.)

Relying on its earlier decision in *Dept. of Mental Hygiene* v. *Kirchner, supra,* 60 Cal.2d at p. 720, the court concluded that the purposes of confinement and treatment or care in commitments pursuant to section 602 encompass " 'the protection of society from the confined person . . . . Hence the cost of maintaining the state institution, including provision of adequate care for its inmates, cannot be arbitrarily charged to one class of society; such assessment violates the equal protection clause.' " (*In re Jerald C., supra,* 36 Cal.3d at p. 8; see also *Pennell* v. *City of San Jose* (1986) 42 Cal.3d 365, 372 [228 Cal.Rptr. 726, 721 P.2d 1111].) Additionally, the court recognized that "the common law duty to support minor children does not authorize the state to recover the costs of confinement imposed for the protection of society and the minor and his rehabilitation." (*In re Jerald C., supra,* 36 Cal.3d at p. 10; see also *County of Ventura* v. *Stark, supra,* 158 Cal.App.3d at p. 1118.)

Respondent seeks to distinguish *Jerald C.* from the case at bench on two grounds: first, the statutory basis for reimbursement—in *Jerald C.,* section 903 was declared unconstitutional, while here the county seeks to recover AFDC benefits under authority of section 11350—and second, the fact that appellants' child was placed in a nonsecure, private group home rather than confined in juvenile hall, a secure facility like Jerald C. Respondent stresses that under the current statutory scheme AFDC funds cannot be used to support juveniles confined in secure institutions, and thus the placement of appellants' minor in group homes was not for the benefit of society as in *Jerald C.*

The focus of our inquiry must be upon whether the purposes of the minor's confinement include the protection of society. (*Jerald C., supra,* 36 Cal.3d at p. 7.) "As we noted in *Terminal Plaza Corp.* v. *City and County of San Francisco* (1986) 177 Cal.App.3d 892, 910 [223 Cal.Rptr. 379]: 'The basis for the equal protection violation is that society as a whole benefits from the incarceration; . . .' 'It is a denial of equal protection when the government seeks to charge the cost of operation of a state function, conducted for the benefit of the public, to a particular class of persons. (*Nor-*

*wood* v. *Baker* (1898) 172 U.S. 269, 279 et seq. [43 L.Ed. 443, 447 et seq., 19 S.Ct. 187]; *In re Jerald C.* (1984) 36 Cal.3d 1, 6 [201 Cal.Rptr. 342, 678 P.2d 917]; *Dept. of Mental Hygiene* v. *Kirchner* (1964) 60 Cal.2d 716, 723 [36 Cal.Rptr. 488, 388 P.2d 720, 20 A.L.R. 3d 353] (remanded 380 U.S. 194 [13 L.Ed.2d 753, 85 S.Ct. 871]); sub. opn. 62 Cal.2d 586 [43 Cal.Rptr. 329, 400 P.2d 321, 20 A.L.R. 3d 361].) "To charge the cost of operation of state functions conducted for public benefit to one class of society is arbitrary and violates the basic constitutional guarantee of equal protection of law. [Citation.]" *In re Jerald C., supra,* 36 Cal.3d at p. 6.)' (*Cunningham* v. *Superior Court* (1986) 177 Cal.App.3d 336, 348 [222 Cal.Rptr. 854].)" (*County of Marin* v. *Pezok* (1987) 190 Cal.App.3d 1441, 1445 [236 Cal.Rptr. 56].)

Although the reasons underlying placement of appellants' minor child were the subject of some controversy at trial, the legal basis for the commitment is undisputed. The minor was initially referred to the juvenile court because of emotional disturbance and his sexual molestation of a sibling. He subsequently committed a violation of Vehicle Code section 10852 (unlawful taking of a vehicle without consent of the owner), which "led to his becoming a ward of the Court . . . ." The commitment was pursuant to section 602 and, according to the probation officer in charge of placement, was for three reasons: protection of the public; rehabilitation of the minor, and protection of the family.

Thus, among the obvious objectives served by the placement was the protection of society from possible future criminal acts by the minor. His rehabilitation also benefits society, even as it indirectly promotes the protection of this family. A second critical factor is the involuntary nature of the placement, which resulted directly from juvenile proceedings rather than voluntary or consensual actions on the part of the parents. Nor was it due, as far as we can tell from the record, to any failure or refusal by appellants to provide support for their child.

The fact that respondent seeks reimbursement of AFDC funds pursuant to section 11350 is no basis for distinguishing *Jerald C.* from the present case. As we recently observed in *County of Marin* v. *Pezok, supra,* 190 Cal.App.3d at pp. 1445-1446, "it is the purpose and derivation of the commitment rather than the source of the funds used to pay for it which is dispositive in an equal protection analysis." Here, as in *Pezok,* the commitment resulted from commission of criminal acts and was imposed under section 602 for the benefit of the public. (*Ibid.*; see also *County of Merced* v. *Dominguez* (1986) 186 Cal.App.3d 1513, 1517 [231 Cal.Rptr. 455].) And the fact that Children's Home of Stockton and EE Residential Group Home are not secure facilities does not alter the essential purpose of the detention to protect the public. (*Id.* at pp. 1517-1518.) Accordingly, under the

compulsion of *Jerald C.,* we conclude that the county is precluded from obtaining reimbursement from appellants for the AFDC funds used to care for their minor child. *(Ibid.)* [End of Court of Appeal opinion.]

I would affirm the judgment of the Court of Appeal.