[No. B124218. Second Dist., Div. Five. Aug. 23, 1999.]

COUNTY OF LOS ANGELES, Plaintiff and Appellant, v.
JOANNE SMITH, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IV.D.

502

**COUNSEL**

Gil Garcetti, District Attorney, Patrick Moran and Susan E. Skelding, Deputy District Attorneys, for Plaintiff and Appellant.

Thomas E. Beltran and Margaret S. Oppel for Defendant and Appellant.

**OPINION**

**TURNER, P. J.—**

### I. INTRODUCTION

Welfare and Institutions Code[1] section 903 provides in relevant part: "The . . . mother . . . liable for the support of a minor . . . shall be liable for the reasonable costs of support of the minor while the minor is placed, or detained in, or committed to, any institution . . . or pursuant to an order of the juvenile court." In this case, we determine whether the mother of a very disturbed minor who is a ward of the court pursuant to section 602 may be liable for the "reasonable costs of support" (§ 903) when he is placed in a special education facility given the provisions of the Individuals With Disabilities Education Act. (20 U.S.C. § 1400 et seq.)

This is an appeal and cross-appeal from a judgment in a proceeding brought under section 11350 by the County of Los Angeles (the county), for a child support order against Joanne Smith for her minor child, Michael F., who is in a foster care placement after he became a ward of the court pursuant to section 602. The judgment denied any request for an order for prospective child support but ordered restitution of benefits paid under the Temporary Assistance to Needy Families program which was formerly referred to as Aid for Families With Dependent Children (AFDC).

The county appeals from that portion of the judgment determining Ms. Smith was not liable for prospective support from the first day of the month following the hearing in this case based upon the Individuals With Disabilities Education Act (20 U.S.C. § 1400 et seq.) which provides a "free appropriate public education" to all minor children with disabilities under the specified circumstances. The county argues the trial court erred in determining this issue in a child support proceeding pursuant to sections 11350 and 11350.1.[2] Sections 11350 and 11350.1 were enacted by California to implement child support programs in compliance with federal mandates under title IV-D of the Social Security Act. (42 U.S.C. § 602 et seq.)

---

[1]Unless other wise noted, all future statutory references are to the Welfare and Institutions Code.

[2]Section 11350 provides: "(a) In any case of separation or desertion of a parent or parents from a child or children which results in aid under this chapter being granted to that family, the noncustodial parent or parents shall be obligated to the county for an amount equal to the following: [¶] (1) The amount specified in an order for the support and maintenance of such family issued by a court of competent jurisdiction; or in the absence of such court order, the amount specified in paragraph (2). [¶] (2) The amount of support which would have been specified in an order for the support and maintenance of the family during the period of separation or desertion provided that any such amount in excess of the aid paid to the family shall not be retained by the county, but disbursed to the family. [¶] (3) The obligation shall be

The mother appeals from that portion of the judgment determining she is liable for retroactive payments of $6,944 from the date the county first expended the Temporary Assistance to Needy Families funds on behalf of the minor to the first day of the month following the hearing when the court determined that her son was in fact eligible for a free appropriate public education pursuant to the Individuals With Disabilities Education Act. The mother contends the county is a political subdivision of the state, which is involved in the education of children with disabilities. Hence, Ms. Smith argues the county has an independent duty to comply with the provisions of the Individuals With Disabilities Education Act, which requires that her son be provided a residential placement without cost to her. This is because the minor has been determined to be seriously emotionally disturbed.

We conclude that, based on the evidence before the trial court and its factual findings, it properly concluded that the Individuals With Disabilities Education Act prevents the county from securing reimbursement for future costs incurred in connection with care provided for the minor. We agree with and affirm the trial court's determination that Ms. Smith was not responsible

---

reduced by any amount actually paid by such parent directly to the custodian of the child or to the district attorney of the county in which the child is receiving aid during the period of separation or desertion for the support and maintenance of the family. [¶] (b) The district attorney shall take appropriate action pursuant to this section as provided in subdivision (l) of Section 11475.1. The district attorney may establish liability for child support as provided in subdivision (a) when public assistance was provided by another county or by other counties. [¶] (c) The amount of the obligation established under paragraph (2) of subdivision (a) shall be determined by using the appropriate child support guidelines currently in effect. If one parent remains as a custodial parent, the guideline support shall be computed in the normal manner. If neither parent remains as a custodial parent, the support shall be computed by combining the noncustodial parents' incomes and placing the figure obtained in the column for noncustodial parent. A zero shall be placed in the column for the custodial parent and the amount of guideline support resulting shall be proportionately shared between the parents as directed by the court. The parents shall pay the amount of support specified in the support order to the district attorney." Section 11350.1 states in pertinent part: "(a) Notwithstanding any other statute, in any action brought by the district attorney for the support of a minor child or children, the action may be prosecuted in the name of the county on behalf of the child, children, or a parent of the child or children. The parent who has requested or is receiving support enforcement services of the district attorney shall not be a necessary party to the action but may be subpoenaed as a witness. Except as provided in subdivision (e), in an action under this section there shall be no joinder of actions, or coordination of actions, or cross-complaints, and the issues shall be limited strictly to the question of parentage, if applicable, and child support, including an order for medical support. A final determination of parentage may be made in any action under this section as an incident to obtaining an order for support. An action for support or parentage pursuant to this section shall not be delayed or stayed because of the pendency of any other action between the parties. [¶] (b) Judgment in an action brought pursuant to this section, and in an action brought pursuant to Section 11350, if at issue, may be rendered pursuant to a noticed motion, that shall inform the defendant that in order to exercise his or her right to trial, he or she must appear at the hearing on the motion."

for the future support costs to be incurred for the care of her son. However, we conclude that the Individuals With Disabilities Education Act also prevents the county from securing reimbursement for past costs of care provided for the minor while he was subject to an individualized education plan; hence, we, with respect, disagree with that portion of the judgment that imposed a duty on the mother to reimburse the county for past costs of care for the minor when he was subject to care pursuant to an individualized education plan. We therefore .reverse the order providing for retroactive support while the minor was subject to the individualized education plan.

## II.   The Individuals With Disabilities Education Act

### A.   *Statutory Construction and Supremacy Clause Jurisprudence*

Resolution of the present case is dependent in material part on the application of the Individuals With Disabilities Education Act, a federal statute.   ▆   Because we are applying a federal statute, we follow rules of statutory construction enunciated by the United States Supreme Court. ▆   In *Kaiser Aluminum & Chemical Corp.* v. *Bonjorno* (1990) 494 U.S. 827, 835 [110 S.Ct. 1570, 1595, 108 L.Ed.2d 842], quoting from *Consumer Product Safety Comm'n* v. *GTE Sylvania* (1980) 447 U.S. 102, 108 [100 S.Ct. 2051, 2056, 64 L.Ed.2d 766], the United States Supreme Court held: "The starting point for interpretation of a statute 'is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'" The United States Supreme Court has noted that "the statutory language controls its construction" (*Ford Motor Credit Co.* v. *Cenance* (1981) 452 U.S. 155, 158, fn. 3 [101 S.Ct. 2239, 2244, 68 L.Ed.2d 744]) and that " '[t]here is, of course, no more persuasive evidence of the purpose of a statute than the words by which the [L]egislature undertook to give expression to its wishes.'" (*Griffin* v. *Oceanic Contractors, Inc.* (1982) 458 U.S. 564, 571 [102 S.Ct. 3245, 3250, 73 L.Ed.2d 973].) In interpreting a statute, the United States Supreme Court has noted: " 'In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' [Citations.] Our objective in a case such as this is to ascertain the congressional intent and give effect to the legislative will." (*Philbrook* v. *Glodgett* (1975) 421 U.S. 707, 713 [95 S.Ct. 1893, 1898, 44 L.Ed.2d 525].) On another occasion, the court stated, "We do not, however, construe statutory phrases in isolation; we read statutes as a whole." (*United States* v. *Morton* (1984) 467 U.S. 822, 828 [104 S.Ct. 2769, 2773, 81 L.Ed.2d 680], fn. omitted.) Further, in interpreting a statute, the Supreme Court has emphasized the importance of avoiding: "absurd results" (*United States* v. *Turkette* (1981) 452 U.S. 576, 580 [101 S.Ct. 2524, 2527,

69 L.Ed.2d 246]); " 'an odd result' " (*Public Citizen* v. *Department of Justice* (1989) 491 U.S. 440, 454 [109 S.Ct. 2558, 2567, 105 L.Ed.2d 377]); or "unreasonable results whenever possible." (*American Tobacco Co.* v. *Patterson* (1982) 456 U.S. 63, 71 [102 S.Ct. 1534, 1538, 71 L.Ed.2d 748].) Moreover, the Supreme Court has noted, "Judicial perception that a particular result would be unreasonable may enter into the construction of ambiguous provisions, but cannot justify disregard of what Congress has plainly and intentionally provided." (*Commissioner* v. *Asphalt Products Co., Inc.* (1987) 482 U.S. 117, 121 [107 S.Ct. 2275, 2278, 96 L.Ed.2d 97].) In *Griffin* v. *Oceanic Contractors, Inc., supra,* 458 U.S. at page 571 [102 S.Ct. at page 3250], the court stated: "Nevertheless, in rare cases the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling. . . . [Citations.]" When a statute is unambiguous, its language cannot "be expanded or contracted by the statements of individual legislators or committees during the course of the" legislative process. (*West Virginia Univ. Hospitals, Inc.* v. *Casey* (1991) 499 U.S. 83, 98-99 [111 S.Ct. 1138, 1147, 113 L.Ed.2d 68].)

Additionally at issue is the application of the supremacy clause of the United States Constitution (Supremacy Clause) in terms of California's obligation to comply with the Individuals With Disabilities Education Act as to Ms. Smith. (U.S. Const., art. VI, cl. 2.) The Supremacy Clause can limit state court enforcement of delinquency court reimbursement costs. ■ In *Gregory* v. *Ashcroft* (1991) 501 U.S. 452, 460 [111 S.Ct. 2395, 2400-2401, 115 L.Ed.2d 410], the United States Supreme Court described the effect of the Supremacy Clause as follows: "The Federal Government holds a decided advantage in this delicate balance: the Supremacy Clause. U.S. Const., Art. VI, cl. 2. As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States. Congress may legislate in areas traditionally regulated by the States. This is an extraordinary power in a federalist system. It is a power that we must assume Congress does not exercise lightly." The United States Supreme Court has repeatedly relied on the Supremacy Clause to preempt state laws on a variety of subjects related to judicial proceedings. (*Block* v. *North Dakota* (1983) 461 U.S. 273, 288-289 [103 S.Ct. 1811, 1820, 75 L.Ed.2d 840] [congressionally adopted statute of limitations binding on states pursuant to Supremacy Clause, the Tenth Amendment notwithstanding]; *Fidelity Federal Sav. and Loan Assn.* v. *de la Cuesta* (1982) 458 U.S. 141, 150-159 [102 S.Ct. 3014, 3020-3025, 73 L.Ed.2d 664] [California courts must enforce due-on-sale clause because of regulation promulgated by Federal Home Loan Bank]; *FERC* v. *Mississippi* (1982) 456 U.S. 742, 760-761 [102 S.Ct. 2126, 2138, 72 L.Ed.2d 532] [Supremacy Clause permits federal regulation of state public utility despite Tenth Amendment]; *Testa* v. *Katt* (1947) 330 U.S. 386,

389-393 [67 S.Ct. 810, 812-814, 91 L.Ed. 967, 172 A.L.R. 225] [under Supremacy Clause, Rhode Island courts must enforce federally mandated price controls]; *Hauenstein* v. *Lynham* (1879) 100 U.S. 483, 488-491 [25 L.Ed. 628, 630-631] [Virginia courts required by Supremacy Clause to enforce terms of Swiss-American treaty in probate case].) Preemption under the Supremacy Clause can occur under the following circumstances: "Our past cases have recognized that the Supremacy Clause, U.S. Const., Art. VI, may entail preemption of state law either by express provision, by implication, or by a conflict between federal and state law. See *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U.S. 190, 203-204 [103 S.Ct. 1713, 1721-1722, 75 L.Ed.2d 752] (1983); *Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447] (1947). And yet, despite the variety of these opportunities for federal preeminence, we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of preemption with the starting presumption that Congress does not intend to supplant state law. See *Maryland* v. *Louisiana*, 451 U.S. 725, 746 [101 S.Ct. 2114, 2128-2129, 68 L.Ed.2d 576] (1981)." (*New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.* (1995) 514 U.S. 645, 654-655 [115 S.Ct. 1671, 1676, 131 L.Ed.2d 695].) The ultimate question in preemption cases is whether Congress intended to preempt state law. (*Medtronic, Inc.* v. *Lohr* (1996) 518 U.S. 470, 484, fn. 6 [116 S.Ct. 2240, 2250, 135 L.Ed.2d 700]; *Barnett Bank of Marion Cty., N.A.* v. *Nelson* (1996) 517 U.S. 25, 30 [116 S.Ct. 1103, 1107, 134 L.Ed.2d 237].)

## B.  *The Statutes and Regulations*

### 1.  *The Individual With Disabilities Education Act*

a)  *The right to a free public education and related services provided for in an individualized education program.*

As background, we note the following federal laws which are pertinent to the disposition of this case. The Individuals With Disabilities Education Act was enacted by Congress in 1975 as the Education of the Handicapped Act, Public Law No. 91-230, sections 601-662, 84 Statutes 175. This 1975 law as amended was renamed in 1990 as the Individuals With Disabilities Education Act. (20 U.S.C. § 1400(d)(1)(A).) The Individuals With Disabilities Education Act guarantees disabled children a substantive right to a "free appropriate public education." (20 U.S.C. § 1400(c); *Florence County School District Four* v. *Carter* (1993) 510 U.S. 7, 12 [114 S.Ct. 361, 364, 126 L.Ed.2d 284] ["Congress intended that IDEA's promise of a 'free appropriate public education' for disabled children would normally be met by an IEP's provision for education in the regular public schools or in private schools chosen jointly by school officials and parents."]; *Honig* v. *Doe*

(1988) 484 U.S. 305, 308-310 [108 S.Ct. 592, 596-597, 98 L.Ed.2d 686]; *Beth V. by Yvonne V.* v. *Carroll* (3d Cir. 1996) 87 F.3d 80, 82.) According to Congress, the statutory purpose of the Individuals With Disabilities Education Act is as follows, "It is the purpose of this chapter to assure that all children with disabilities have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of children with disabilities and their parents or guardians are protected, to assist States and localities to provide for the education of all children with disabilities, and to assess and assure the effectiveness of efforts to educate children with disabilities." (20 U.S.C. § 1400(d)(1)(A); *County of San Diego* v. *Cal. Special Educ. Hearing* (9th Cir. 1996) 93 F.3d 1458, 1461.) To accomplish the purposes and goals of the Individuals With Disabilities Education Act, the statute "provides federal funds to assist state and local agencies in educating children with disabilities but conditions such funding on compliance with certain goals and procedures." (*Ojai Unified School Dist.* v. *Jackson* (9th Cir. 1993) 4 F.3d 1467, 1469; see *Ciresoli* v. *M.S.A.D. No. 22* (D.Me. 1995) 901 F.Supp. 378, 381.)

The term "free public education" is defined in 20 United States Code section 1401(8) as follows: "(8) The term 'free appropriate public education' means special education and related services that— [¶] (A) have been provided at public expense, under public supervision and direction, and without charge; [¶] (B) meet the standards of the State educational agency; [¶] (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and [¶] (D) are provided in conformity with the individualized education program required under section 1414(d) of this title." The "individualized education program" is statutorily defined in 20 United States Code section 1401(11) as follows: "(11) The term 'individualized education program' or IEP means a written statement for each child with a disability developed, reviewed, and revised in accordance with section 1414(d) of this title." Section 1414(d)(1) defines "individualized education program" as "(A) . . . a written statement for each child with a disability that is developed, reviewed, and revised in accordance with this section and that includes— [¶] (i) a statement of the child's present levels of educational performance, . . . [¶] . . . [¶] (ii) a statement of measurable annual goals, including benchmarks or short-term objectives, . . . [¶] . . . [¶] (iii) a statement of the special education and related services and supplementary aids to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child— [¶] . . . [¶] (iv) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class . . . [¶] . . . [¶] (v)(I) a statement of any individual modifications in the administration of State or districtwide assessments of student achievement . . . [¶] . . . [¶] (vi) the projected date for the

beginning of the services and modifications . . . and the anticipated frequency, location, and duration of those services and modifications; [¶] (vii)(I) beginning at age 14, and updated annually, a statement of the transition service needs of the child under the applicable components . . . ; [¶] (II) beginning at age 16 . . . a statement of the transition service needs of the child including, when appropriate, a statement of the interagency responsibilities or any needed linkages . . . [¶] (viii) the projected date for initiation and anticipated duration of such services. . . ." Section 1414(d)(4)(A) requires the local educational agency to ensure that the IEP team "reviews the child's IEP periodically, but not less than annually to determine whether the annual goals are being achieved." Section 1414(d)(5) provides that "If a participating agency, other than the local educational agency, fails to provide the [described] transitions . . . , the local educational agency shall reconvene the IEP Team to identify alternative strategies to meet the transition objectives . . . ." The individualized education plan is developed with the participation of the teacher, parents, a representative of the school district, and if appropriate, the child, so that his or her education is designed to meet the individual's needs. (*County of San Diego* v. *Cal. Special Educ. Hearing*, *supra*, 93 F.3d at p. 1461; *Sacramento City School Dist.* v. *Rachel H.* (9th Cir. 1994) 14 F.3d 1398, 1400, fn. 2) The Individuals With Disabilities Education Act requires a school district to meet with a parent in order to formulate an individualized education plan. (*Florence County School Dist. Four* v. *Carter* (1993) 510 U.S. 7, 13 [114 S.Ct. 361, 365, 126 L.Ed.2d 284].)

b)   *Procedural statutory safeguards*

In order to obtain funding, each state must demonstrate to the federal government that the state has in effect policies and procedures to ensure that children with disabilities and their parents or guardians are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies. (20 U.S.C. §§ 1412, 1415;[3] *Beth V. by Yvonne V.* v. *Carroll*, *supra*, 87 F.3d at p. 82.) The United States Supreme Court has

---

[3]Title 20 United States Code section 1412 provides in pertinent part: "(a) In general. A state is eligible for assistance under this part [20 USCS §§ 1411 et seq.] for a fiscal year if the State demonstrates to the satisfaction of the Secretary that the State has in effect policies and procedures to ensure that it meets each of the following conditions: [¶] (1) Free appropriate public education. [¶] (A) In genaral. A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school. [¶] (B) Limitation. The obligation to make a free appropriate public education available to all children with disabilites does not apply with respect to children: [¶] (i) aged 3 through 5 and 18 through 21 in a State to the extent that its application to those children would be inconsistent with State law or practice, or the order of any court, respecting the provision of public education to children in those age ranges; and [¶] (ii) aged 18 through 21 to the extent that State law does not require that special education and related services under this part [20 USCS §§ 1411 et seq.] be provided to children with disabilities who, in the educational placement prior to their incarceration in an adult correctional facility. [¶] (I) were not actually identified as being a

identified the importance of the procedural requirements imposed by the Individuals With Disabilities Education Act as follows: "When the elaborate and highly specific procedural safeguards embodied in [20 United States Code section] 1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid. It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, see, *e.g.,* [20 United States Code section] 1415(a) [through] (d), as it did upon the measurement of the resulting [individualized education plan] against a substantive standard. We think that the congressional emphasis upon full participation of concerned parties throughout the development of the [individualized education plan], as well as the requirements that state and local plans be submitted to the Secretary for approval, demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an [individualized education plan]." (*Hendrick Hudson Dist. Bd. of Ed.* v. *Rowley* (1982) 458 U.S. 176, 205-206 [102 S.Ct. 3034, 3050, 73 L.Ed.2d 690]; *Collinsgru* v. *Palmyra Bd. of Educ.* (3d Cir. 1998) 161 F.3d 225, 234.) The Individuals With Disabilities Education Act explicitly requires written prior notice to a parent when an agency refuses to initiate or change the educational placement of a disabled child. (20 U.S.C. § 1415(b)(1)(C).) The parents are also entitled to the opportunity to present a complaint about changes "to any matter" relating to a proposed change. (20 U.S.C. § 1415(b)(1)(E).) The presentation of a complaint entitles the parents to a due process administrative hearing. (20 U.S.C. § 1415(b)(2).)

### 2.   *Pertinent United States Department of Education regulations*

Federal regulations also discuss the guarantee of a free appropriate public education for an emotionally disturbed child such as the minor who is receiving care pursuant to an individualized education plan. Title 34, section 300.2(b) of the Code of Federal Regulations (1999) as promulgated by the United States Department of Education sets forth the application of the Individuals With Disabilities Education Act to a political subdivision, such

---

child with a disability under section 602(3) of this Act [20 USCS § 1401(3)]; or [¶] (II) did not have an individualized education program under this part [20 USCS §§ 1411 et seq.]. [¶] (2) Full educational opportunity goal. The state has established a goal of providing full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal." Title 20 United States Code section 1415(a) states: "Any State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies."     .

as the county, as follows: "(b) Public agencies within the State. The provisions of this part— [¶] (1) Apply to all political subdivisions of the State that are involved in the education of children with disabilities, including— [¶] (i) The State educational agency (SEA); [¶] (ii) Local educational agencies (LEAs), educational service agencies (ESAs), and public charter schools that are not otherwise included as LEAs or ESAs and are not a school of an LEA or ESA; [¶] (iii) Other State agencies and schools (such as Departments of Mental Health and Welfare and State schools for children with deafness or children with blindness); and [¶] (iv) State and local juvenile and adult correctional facilities; and [¶] (2) Are binding on each public agency in the State that provides special education and related services to children with disabilities, regardless of whether that agency is receiving funds under Part B." In addition to local entities, the regulations impose a duty on state educational agencies to provide a free appropriate public education to seriously emotionally disturbed children The Department of Education Regulations provide: "Each SEA shall ensure that a child with a disability who is placed in or referred to a private school or facility by a public agency— [¶] (a) Is provided special education and related services— [¶] (1) In conformance with an [individualized education plan] that meets the requirements of §§ 300.340-300.350; and [¶] (2) At no cost to the parents . . . ." (34 C.F.R. § 300.401(a) (1999).)

The purpose of the regulations are as follows: "The purposes of this part are— [¶] (a) To ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living . . . ." (34 C.F.R. § 300.1(a) (1999).) A child with a disability includes one suffering from a "serious emotional disturbance" (34 C.F.R. § 300.7(a)(1) (1999)) which includes the following: "(4) Emotional disturbance is defined as follows: [¶] (i) The term means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance: [¶] (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors. [¶] (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers. [¶] (C) Inappropriate types of behavior or feelings under normal circumstances. [¶] (D) A general pervasive mood of unhappiness or depression. . . ." (34 C.F.R. § 300.7(c)(4) (1999).)

Under the regulations, a child that falls within the definitions set forth in the immediately preceding paragraph, is entitled to a free appropriate public education. Title 34 of the Code of Federal Regulations section 300.300(a) (1999) guarantees this right and states: "(a) General. [¶] (1) Subject to paragraphs (b) and (c) of this section and § 300.311, each State receiving assistance under this part shall ensure that FAPE is available to all children

with disabilities, aged 3 through 21, residing in the State, including children with disabilities who have been suspended or expelled from school."[4] The regulatory definition of the free appropriate public education is as follows: "As used in this part, the term free appropriate public education or FAPE means special education and related services that— [¶] (a) Are provided at public expense, under public supervision and direction, and without charge; [¶] (b) Meet the standards of the SEA, including the requirements of this part; [¶] (c) Include preschool, elementary school, or secondary school education in the State; and [¶] (d) Are provided in conformity with an individualized education program (IEP) that meets the requirements of §§ 300.340-300.350." (34 C.F.R. § 300.13.)

In the present case, as will be noted, the minor is in a private residential program. The county has been paying for that care. The Department of Education regulations speak directly to this situation. The right of a parent to a free education for a seriously emotionally disturbed child extends to placement in a private residential program. The United States Department of Education regulations provide: "If placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, *must be at no cost to the parents of the child.*" (34 C.F.R.

[4]The regulatory exceptions to the guarantee of a free appropriate public education for seriously emotionally disturbed children are inapplicable to this case. The regulatory exceptions are as follows: "(b) Exception for age ranges 3-5 and 18-21. This paragraph provides the rules for applying the requirements in paragraph (a) of this section to children with disabilities aged 3, 4, 5, 18, 19, 20, and 21 within the State: [¶] (1) If State law or a court order requires the State to provide education for children with disabilities in any disability category in any of these age groups, the State must make FAPE available to all children with disabilities of the same age who have that disability. [¶] (2) If a public agency provides education to nondisabled children in any of these age groups, it must make FAPE available to at least a proportionate number of children with disabilities of the same age. [¶] (3) If a public agency provides education to 50 percent or more of its children with disabilities in any disability category in any of these age groups, it must make FAPE available to all its children with disabilities of the same age who have that disability. This provision does not apply to children aged 3 through 5 for any fiscal year for which the State receives a grant under section 619(a)(1) of the Act. [¶] (4) If a public agency provides education to a child with a disability in any of these age groups, it must make FAPE available to that child and provide that child and his or her parents all of the rights under Part B of the Act and this part. [¶] (5) A State is not required to make FAPE available to a child with a disability in one of these age groups if— [¶] (i) State law expressly prohibits, or does not authorize, the expenditure of public funds to provide education to nondisabled children in that age group; or [¶] (ii) The requirement is inconsistent with a court order that governs the provision of free public education to children with disabilities in that State. [¶] (c) Children aged 3 through 21 on Indian reservations. With the exception of children identified in § 300.715(b) and (c), the SEA shall ensure that all of the requirements of Part B of the Act are implemented for all children with disabilities aged 3 through 21 on reservations." (34 C.F.R. § 300.300(b)-(c) (1999).) "FAPE" is an acronym for the term free appropriate public education. The county does not contend that the exceptions in title 34 Code of Federal Regulations section 300.300(b) though (c) (1999) apply to this case.

§ 300.302 (1999), italics added.) If the individualized education plan requires extended school year services, that is included in the right to a free appropriate public education. Title 34 section 300.309(b) of the Code of Federal Regulations (1999) defines "extended school year services" as follows: "(b) Definition. As used in this section, the term extended school year services means special education and related services that— [¶] (1) Are provided to a child with a disability— [¶] (i) Beyond the normal school year of the public agency; [¶] (ii) In accordance with the child's [individualized education plan]; and [¶] (iii) At no cost to the parents of the child; and [¶] (2) Meet the standards of the SEA."

The regulatory guarantee of a free appropriate public education extends beyond the normal school year so long as it complies with the individualized education plan is set forth in title 34, section 300.309(a) of the Code of Federal Regulations (1999) in the following fashion: "(1) Each public agency shall ensure that extended school year services are available as necessary to provide FAPE, consistent with paragraph (a)(2) of this section. [¶] (2) Extended school year services must be provided only if a child's [individualized education plan] team determines, on an individual basis, in accordance with §§ 300.340-300.350, that the services are necessary for the provision of FAPE to the child."[5]

When a state receives funds under the Individuals With Disabilities Education Act, which the parties do not dispute occurs here in California, various local agencies must abide by its terms. Those agencies include any involved in the education of children with disabilities in private institutions and local juvenile correctional facilities. Title 34 Code of Federal Regulations section 300.2, which requires all states receiving funds, as does California, to comply

---

[5]As in the case of the Individuals With Disabilities Education Act, the regulations also provide procedural safeguards for the parents of a disabled child. Section 300.504 of title 34 of the Code of Federal Regulations provides: "(a) General. A copy of the procedural safeguards available to the parents of a child with a disability must be given to the parents, at a minimum— [¶] (1) Upon initial referral for evaluation; [¶] (2) Upon each notification of an IEP meeting; [¶] (3) Upon reevaluation of the child; and [¶] (4) Upon receipt of a request for due process under § 300.507. [¶] (b) Contents. The procedural safeguards notice must include a full explanation of all of the procedural safeguards available under §§ 300.403, 300.500-300.529, and 300.560-300.577, and the State complaint procedures available under §§ 300.660-300.662 relating to— [¶] (1) Independent educational evaluation; [¶] (2) Prior written notice; [¶] (3) Parental consent; [¶] (4) Access to educational records; [¶] (5) Opportunity to present complaints to initiate due process hearings; [¶] (6) The child's placement during pendency of due process proceedings; [¶] (7) Procedures for students who are subject to placement in an interim alternative educational setting; [¶] (8) Requirements for unilateral placement by parents of children in private schools at public expense; [¶] (9) Mediation; [¶] (10) Due process hearings, including requirements for disclosure of evaluation results and recommendations; [¶] (11) State-level appeals (if applicable in that State); [¶] (12) Civil actions; [¶] (13) Attorneys' fees; and [¶] (14) The State complaint procedures under §§ 300.660-300.662, including a description of how to file a complaint and the timelines under those procedures. [¶] (c) Notice in understandable language. The notice required under paragraph (a) of this section must meet the requirements of § 300.503(c)."

with Individuals With Disabilities Education Act and its regulations provides: "(a) States. This part applies to each State that receives payments under Part B of the Act. [¶] (b) Public agencies within the State. The provisions of this part— [¶] (1) Apply to all political subdivisions of the State that are involved in the education of children with disabilities, including— [¶] (i) The State educational agency (SEA); [¶] (ii) Local educational agencies (LEAs), educational service agencies (ESAs), and public charter schools that are not otherwise included as LEAs or ESAs and are not a school of an LEA or ESA; [¶] (iii) Other State agencies and schools (such as Departments of Mental Health and Welfare and State schools for children with deafness or children with blindness); and [¶] (iv) State and local juvenile and adult correctional facilities; and [¶] (2) Are binding on each public agency in the State that provides special education and related services to children with disabilities, regardless of whether that agency is receiving funds under Part B. [¶] (c) Private schools and facilities. Each public agency in the State is responsible for ensuring that the rights and protections under Part B of the Act are given to children with disabilities— [¶] (1) Referred to or placed in private schools and facilities by that public agency; or [¶] (2) Placed in private schools by their parents under the provisions of § 300.403(c)." Clearly, any local agency which is "involved in the education of children with disabilities" (34 C.F.R. § 300.2(b)(1) (1999) is subject to the Individuals With Disabilities Education Act when a state, as does California, receives funding from the federal government for that purpose.[6]

## III. PROCEDURAL AND FACTUAL HISTORY

### A. *Procedural Matters*

On July 2, 1997, the county filed a complaint against Ms. Smith for retroactive and future child support for the Temporary Assistance to Needy Families funds expended on behalf of her child, Michael. The mother answered the complaint and asserted as an affirmative defense that she was not obligated to pay any support for her child pursuant to 20 United States Code section 1401(8), the Individuals With Disabilities Education Act.

On October 3, 1997, the county filed a motion for judgment, pursuant to sections 903, subdivision (c)(4)[7] and 11350, to establish maternity, child support, and retroactive arrears for a minor child placed in an institution and

---

[6]The parties have extensively briefed California's statutory and regulatory efforts to comply with the Individuals With Disabilities Education Act. (Ed. Code, § 56000 et seq.; Gov. Code, § 7570 et seq.; Welf. & Inst. Code, § 18350 et seq.; Cal. Code Regs., tit. 2, § 60100 et seq.; *Nevada County Office of Education* v. *Riles* (1983) 149 Cal.App.3d 767, 772 [197 Cal.Rptr. 152]; *Newport-Mesa Unified School Dist.* v. *Hubert* (1982) 132 Cal.App.3d 724, 728 [183 Cal.Rptr. 334].) Because we have resolved this appeal solely on federal preemption grounds, it is unnecessary to discuss the provisions of California law that comply with the Individuals With Disabilities Education Act.

[7]Section 903, subdivision (c) states: "(c) It is the intent of the Legislature in enacting this subdivision to protect the fiscal integrity of the county, to protect persons against whom the

for whom Temporary Assistance to Needy Families (formerly AFDC) funds had been and would be expended. The trial court, after taking testimony, issued the following order on June 5, 1998. The trial court directed that Ms. Smith reimburse the county for the time period from November 27, 1996, until June 30, 1998. The total amount of support for that time period was $6,944. This time period commenced when the minor was placed in a nonsecure facility after the October 1, 1996, order of wardship pursuant to section 602. The minor was placed in the secure facility on November 27, 1996. The time period for which reimbursement was ordered ended 25 days after the entry of the judgment in the present case. As previously noted, the hearing was concluded on June 5, 1998. The trial court concluded that there was a reimbursement obligation owed by Ms. Smith through June 30, 1998. The court fixed the amount of reimbursement in the sum of $6,944. The trial court further found in favor of Ms. Smith as to any future reimbursement obligations which may be incurred after June 30, 1998. In other words, the trial court ordered Ms. Smith to reimburse the county for the period of time the minor was in placement up through the end of the month when the trial was held. However, as to the future costs incurred by the county while the minor was placed, the trial court concluded Ms. Smith owed no reimbursement obligation. The trial court specifically found the minor was entitled to a free appropriate public education.

county seeks to impose liability from excessive charges, to ensure reasonable uniformity throughout the state in the level of liability being imposed, and to ensure that liability is imposed only on persons with the ability to pay. In evaluating a family's financial ability to pay under this section, the county shall take into consideration the family's income, the necessary obligations of the family, and the number of persons dependent upon this income. Except as provided in paragraphs (1), (2), (3), and (4), 'costs of support' as used in this section means only actual costs incurred by the county for food and food preparation, clothing, personal supplies, and medical expenses, not to exceed a combined maximum cost of fifteen dollars ($15) per day, except that: [¶] (1) The maximum cost of fifteen dollars ($15) per day shall be adjusted every third year beginning January 1, 1988, to reflect the percentage change in the calendar year annual average of the California Consumer Price Index, All Urban Consumers, published by the Department of Industrial Relations, for the three-year period. [¶] (2) No cost for medical expenses shall be imposed by the county until the county has first exhausted any eligibility the minor may have under private insurance coverage, standard or medically indigent Medi-Cal coverage, and the Robert W. Crown California Children's Services Act (Article 2 (commencing with Section 248) of Chapter 2 of Part 1 of Division 1 of the Health and Safety Code). [¶] (3) In calculating the cost of medical expenses, the county shall not charge in excess of 100 percent of the AFDC fee for service average Medi-Cal payment for that county for that fiscal year as calculated by the State Department of Health Services; however, if a minor has extraordinary medical or dental costs that are not met under any of the coverages listed in paragraph (2), the county may impose these additional costs. [¶] (4) For those placements of a minor subject to this section in which an AFDC-FC grant is made, the district attorney shall seek an order pursuant to Section 11350 and the statewide child support guideline in effect in Article 2 (commencing with Section 4050) of Chapter 2 of Part 2 of Division 9 of the Family Code. For purposes of determining the correct amount of support of a minor subject to this section, the rebuttable presumption set forth in Section 4057 of the Family Code is applicable."

## B. *Factual Matters*

The testimony in the present case, when viewed in a light most favorable to the determination that the minor was entitled to a free appropriate public education, was as follows. Ms. Smith testified that the minor began to display severe emotional problems beginning in the fourth grade. While he was in the fourth grade, Ms. Smith received a telephone call from the minor's school. She was informed that the minor "wrapped a jump rope around his neck and was trying to hang himself in the bathroom." Ms. Smith then began to secure counseling for the minor through the church they attended.

In April 1996, the William S. Hart Unified School District had an individualized education plan prepared for the minor. Prior to the development of the individualized education plan, the minor was failing his school classes. The minor was placed in an extended day program prior to the preparation of the individualized education plan. The minor's individualized education plan was the result of a March 6, 1996, referral for an assessment. On April 16, 1996, an individualized education plan was developed. The April 16, 1996, individualized education plan stated in reference to the minor, "[H]e has a long history of emotional concerns and that this has existed for a long time to a marked degree and has adversely affected his educational performance." On this basis, the minor was placed in a "special class for severely emotionally disturbed" children. He was approved by the district for "school counseling within the school site at one session per week for 50 minutes." The April 16, 1996, individualized education plan resulted in a designation of the minor as severely emotionally disturbed.

Dr. James J. Kehr, a diplomat and senior analyst of the American Board of Disabilities Analysts, was a credentialed school psychologist, psychometrist, and teacher. He testified he was the director of the nonprofit Center for Attention Disorders and had participated in the development of hundreds, if not one thousand, of individualized education plans. Dr. Kehr testified that based upon the minor's serious emotional problems, as part of the development of the April 16, 1996, individualized education plan, there should have been a referral to determine whether the youngster should be placed in a residential care program. The district failed to make such a referral. Moreover, the individualized education plan was not discussed with Ms. Smith, as was mandated by state and federal law. Ms. Smith testified that the only kind of services offered by the district were "little after school programs, preventive kind of programs."

Dr. Kehr testified the individualized education plan for the minor was updated on June 11 and 25, 1996. The June 11, 1996, update indicated that

the minor was a runaway. The June 25, 1996, update indicated that he returned on the last day of school. The minor was living in the private home of a couple from the church the minor attended. The June 25, 1996, update indicated that the minor continued to be severely emotionally disturbed. After the June 25, 1996, update, the school psychologist for the district wrote a letter which was summarized by Dr. Kehr as follows: "[S]he believed that he lacked the self-discipline to maintain adequate functioning on his own and that he clearly needed a highly structured therapeutic setting. And this would be the only possibility to rehabilitate his life before it was too late." According to Dr. Kehr, the district's psychologist was stating clearly that the minor "needed residential treatment at that point." Dr. Kehr testified it was quite common for the district to pay for residential treatment under such circumstances. Dr. Kehr testified that the 1996 individualized education program did not address the minor's unique needs. Dr. Kehr believed that a full assessment should have been done at the time of the preparation of the April 16, 1996, individualized education program to determine whether the minor needed to be placed in residential care because of the child's "several suspensions" from school, violence, "inappropriate school behavior," and severe emotional disturbance.

Eventually, the minor came under the jurisdiction of the juvenile court as the result of a series of events testified to by his mother, Ms. Smith. During one of the minor's runaway episodes, he took a wallet from a parked car. The window was down and the wallet was in the car. The minor took the wallet and removed some credit cards. Later in the day, Ms. Smith receive a telephone call from the sheriff's station in Santa Clarita. Ms. Smith was advised that the minor had "turned himself in." A deputy sheriff returned the stolen credit cards to Ms. Smith. The deputy told Ms. Smith to return the credit cards to the owner. She took the cards and attempted to find the owner. The next day, the minor ran away again. She notified the sheriff's department. Another deputy came to her residence. She told the deputy about the credit cards. This deputy took the credit cards from her in an effort to find the owner. The deputy who came to her residence thought it was unusual that Ms. Smith had been advised by another deputy sheriff to return the stolen credit cards to the owner. After this incident, Ms. Smith received a telephone call from a deputy probation officer named Barney Bartelle. After several meetings with Mr. Bartelle, the credit card incident was used as a basis for the filing of a petition seeking a wardship order pursuant to section 602. A wardship order was later entered and the minor was eventually suitably placed.

Robert Kelleher, administrator of Harbor View Adolescent Center in Long Beach, testified that the minor was placed in that facility by the probation

department. The minor had been certified for placement in the Harbor View Adolescent Center by the Los Angeles County Department of Mental Health. All the children at the Harbor View Adolescent Center were present in compliance with individualized education plans. Mr. Kelleher testified as to the facility at which the minor was placed as follows: "All children have an individual education plan at Harbor View Center if they're going to go to our school, which is a Regency high school. [¶] We have our own state certified non-high school on-site and Long Beach Unified School District, or any school district, will not certify them for payment unless they have an I.E.P." Part of the record on appeal includes the individualized education program prepared on October 10, 1997, by the Long Beach Unified School District. The "Eligibility Statement" portion of the individualized education program indicated that the minor was diagnosed as severely emotionally disturbed. Mr. Kelleher testified that "the county" paid for the minor's care.

## IV   DISCUSSION

### A.   The County Is Not Entitled to Reimbursement for Any Costs Expended to Support the Minor While He Is Being Housed at the Harbor View Adolescent Center Pursuant to an Individualized Education Program.

■    It is undisputed that as long as a minor has been placed in the Harbor View Adolescent Center in Long Beach, he has been the subject of an individualized education plan. Further, there can be no serious dispute that the Individuals With Disabilities Education Act and its accompanying regulations prohibit the State of California or any of its local agencies involved in the education of disabled children from requiring Ms. Smith to bear those costs. As noted previously, a child subject to an individualized education program is entitled to a "free appropriate public education." (20 U.S.C. § 1400(c); *Honig* v. *Doe, supra,* 484 U.S. 305, 308-310 [108 S.Ct. 592, 596-597].) If a seriously emotionally disturbed child cannot function in a normal school setting, the right to a free public education at no charge to a parent extends to situations where a youngster is placed in a public or private residential program. (34 C.F.R. §§ 300.302, 300.309(b) (1999).)

The county argues that it is not subject to the Individuals With Disabilities Education Act. However, the purpose of the Individuals With Disabilities Education Act is to assist localities in providing for the education of all children with disabilities. (20 U.S.C. § 1400(c); *County of San Diego* v. *Cal.*

*Special Educ. Hearing, supra,* 93 F.3d at p. 1461.) Further, the individualized education program developed for the minor in this case was the result of an assessment by the Long Beach Unified School District. The county does not dispute that the Long Beach Unified School District cannot charge for the comprehensive services provided to the minor. Nonetheless, title 34 of the Code of Federal Regulations section 300.2(a) indicates that the regulatory scope of the Individuals With Disabilities Education Act extends to each state that receives payments, which California does. Further, title 34 of the Code of Federal Regulations section 300.2(b) applies to "all political subdivisions of the State that are involved in the education of children with disabilities," which includes local juvenile correctional facilities. In the present case, as result of the orders of the juvenile court, a minor is detained in a locked facility while subject to an individualized education program. Mr. Kelleher testified that the Harbor View Adolescent Center in Long Beach where the minor was detained and treated received its checks from "the county." The suggestion by the county it is not "involved" in the special educational services provided to the minor for which it pays is meritless.

Accordingly, to enforce section 903 against Ms. Smith for costs incurred while the minor was in custody and subject to an individualized education plan pursuant to the Individuals With Disabilities Education Act would violate the supremacy clause of the Constitution of the United States. In the present case, the county is attempting to have Ms. Smith reimburse it for the costs it paid to the Harbor View Adolescent Center for the care of the minor, who was subject to an individualized education plan. Federal law explicitly requires that such assistance be provided to a disabled youngster "at no cost to the parents of the child." (34 C.F.R. § 300.302 (1999).) California courts may not require reimbursement consistent with the supremacy clause. In the present case, the trial court refused to order reimbursement for the county for future costs incurred while minor was kept in the Harbor View Adolescent Center in Long Beach. The express ground stated by the trial court was that the minor was entitled to a free appropriate public education. We affirm the trial court's ruling in that regard.

However, the trial court ordered that the county be reimbursed for its costs incurred through the end of the month during which the hearing was held. The hearing was held on June 5, 1998. Included in the record on appeal is the individualized education program prepared for the minor by the Long Beach Unified School District which is dated October 10, 1997. To require reimbursement from any date after October 10, 1997, would contravene the Individuals With Disabilities Education Act. Insofar as the trial court ordered such reimbursement, the order under review is reversed.

### B. *The California Legislature's Statutory Compliance With Title IV of the Social Security Act Does Not Avoid the Preemptive Effect of the Congressional Enactment of the Individuals With Disabilities Education Act in This Case.*

The county contends the Individuals With Disabilities Education Act does not preempt its rights to seek reimbursement pursuant to sections 903 and 11350. The argument of the county is as follows. The State of California receives federal funds under the Temporary Assistance to Needy Families program pursuant to title IV of the Social Security Act. (42 U.S.C. § 601 et seq.) Temporary Assistance to Needy Families is an elective program under which states receive federal funds in order to provide welfare services to needy families. (*King* v. *Smith* (1968) 392 U.S. 309, 325 [88 S.Ct. 2128, 2137, 20 L.Ed.2d 1118]; *County of San Mateo* v. *Dell J.* (1988) 46 Cal.3d 1236, 1242 [252 Cal.Rptr. 478, 762 P.2d 1202].) The United States Supreme Court has described the manner in which Temporary Assistance to Needy Families funds are dispersed and the philosophy underlining the program as follows: " ' "The AFDC program is based on a scheme of cooperative federalism." *King* v. *Smith*, 392 U.S. 309, 316 [88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118] (1968). Established by Title IV of the Social Security Act of 1935, 49 Stat. 627, "to provide financial assistance to needy dependent children and the parents or relatives who live with and care for them," *Shea* v. *Vialpando*, 416 U.S. 251, 253 [94 S.Ct. 1746, 1750, 40 L.Ed.2d 120] (1974), the federal program reimburses each State which chooses to participate with a percentage of the funds it expends. [Social Security Act,] § 403, 42 U.S.C. § 603. In return, the State must administer its assistance program pursuant to a state plan that conforms to applicable federal statutes and regulations. [Social Security Act,] § 402, 42 U.S.C. § 602.' *Heckler* v. *Turner*, 470 U.S. 184, 189 [105 S.Ct. 1138, 1141, 84 L.Ed.2d 138] (1985)." (*Bowen* v. *Gilliard* (1987) 483 U.S. 587, 589, fn. 1 [107 S.Ct. 3008, 3011, 97 L.Ed.2d 485].)

As part of title IV of the Social Security Act, under appropriate circumstances, the states are required to attempt to collect funds expended for the support of needy children from their parents. The California Supreme Court has described the applicable federal law as follows: "Lastly, part D of subchapter IV (42 U.S.C. § 651 et seq.) requires the state to seek reimbursement of child support from the parents in order to remain eligible for participation in the federally funded AFDC program. Parent recipients of AFDC are required to assign to the state as a condition of receiving benefits any rights to support which they or their children may have. (42 U.S.C. § 602(a)(26)(A).) Collection *must* be pursued in the case of any child with respect to whom such an assignment of rights to child support is effective,

*including assignments with respect to children on whose behalf a state agency is making foster care maintenance payments*, to secure support from any person who is legally liable. (42 U.S.C. § 654(4)(B).)" (*County of San Mateo v. Dell J., supra,* 46 Cal.3d at p. 1244, italics in original; accord, *State of Ohio v. Barron* (1997) 52 Cal.App.4th 62, 74 [60 Cal.Rptr.2d 342].) The consequence of failing to seek reimbursement for moneys expended under the Temporary Assistance to Needy Families program is that penalties are imposed by the federal government. The California Supreme Court has synthesized the relevant law as follows: "To summarize then, where a state fails to seek reimbursement from a minor's parents for federally funded AFDC-FC maintenance payments expended to support the child who is removed from the home, voluntarily or involuntarily by court order, and placed in a nondetention foster care facility, it may stand in violation of federal law, and thereby subject itself to a percentage penalty reduction or loss of its AFDC program eligibility and funding altogether. (See 42 U.S.C. §§ 603, 671(b).)" (*County of San Mateo v. Dell J., supra,* 46 Cal.3d at p. 1244.) An action pursuant to section 11350 is the method by which the duty of reimbursement is enforced. (*State of Ohio v. Barron, supra,* 52 Cal.App.4th at pp. 72-73; *City and County of San Francisco v. Thompson* (1985) 172 Cal.App.3d 652, 655 [218 Cal.Rptr. 445].) The county reasons, therefore, because it owes a duty under federal law to seek reimbursement for moneys paid in support of the minor under the Temporary Assistance to Needy Families program, no preemption occurs under the Individuals With Disabilities Education Act. We disagree.

As noted previously, this is an issue involving statutory interpretation. When construing federal legislative enactments, the United States Supreme Court has held the starting point for interpretation of laws is the language of the statute itself. (*Kaiser Aluminum & Chemical Corp. v. Bonjorno, supra,* 494 U.S. at p. 835 [110 S.Ct. at pp. 1575-1576]; *Consumer Product Safety Comm'n v. GTE Sylvania, supra,* 447 U.S. at p. 108 [100 S.Ct. at p. 2056].) The federal statutes and related regulations could not be clearer. A seriously emotionally disturbed child who is receiving care pursuant to an individualized education plan is entitled to a free appropriate public education at no cost to a parent. (20 U.S.C. §§ 1400(c), 1401(8); 34 C.F.R. § 300 et seq.; *Honig v. Doe, supra,* 484 U.S. at pp. 308-310 [108 S.Ct. at pp. 596-597].) The statutes and regulations are clear and unambiguous, the services are provided at no cost to the parent.

Moreover, in support of its contention that no preemption occurs under the Individuals With Disabilities Education Act, the county relies on state statutes such as sections 903 and 11350. However, the federal statutes and regulations certainly preempt state statutes such as sections 903 and 11350.

No doubt, section 11350 (for example) was enacted in order to comply with federal law. But, simply stated, it is only a state law. The aforementioned provisions of the Individuals With Disabilities Education Act and the regulations propounded by the United States Department of Education have preemptive effect under these narrow circumstances. Additionally, the county has cited to no regulations or legislative history which supports the proposition that the duty of reimbursement owed under a state law adopted in compliance with title IV of the Social Security Act overrides the explicit language appearing in the Individuals with Disabilities Education Act and the regulations concerning a free appropriate public education for a seriously emotionally disturbed minor who is kept in placement pursuant to an individualized education plan. Finally, because the minor is in custody in compliance with an individualized education plan, the county is entitled to reimbursement from the state and federal governments. What is occurring in this case is that the county is seeking reimbursement from Ms. Smith when it is entitled to similar relief from the federal government through the State of California. (20 U.S.C. §§ 1411-1412; *Cedar Rapids Community School Dist. v. Garret F.* (8th Cir. 1997) 106 F.3d 822, 824, affirmed *sub nom. Cedar Rapids Community School Dist. v. Garret F.* (1999) 526 U.S. 66 [119 S.Ct. 992, 143 L.Ed.2d 154]; *U.S.* ex rel. *Hopper v. Anton* (9th Cir. 1996) 91 F.3d 1261, 1266.) Our review of the language of the relevant federal statutes and regulations and pertinent legislative history does not support the contention that the county can seek reimbursement from both Ms. Smith and the national government.

## C. *Conclusion*

As can be noted, we agree with the trial court that the minor is entitled to a free appropriate public education. As to all the time the minor has spent in custody while subject to an individualized education plan, there is no duty of reimbursement. We cannot tell from the present record when the minor was in custody while subject to an individualized education plan. The sums of money due were the subject of a stipulation between the parties and there was no individual breakdown as to costs incurred during particular time periods. Accordingly, as to costs incurred prior to the entry of judgment, the judgment is reversed. Upon issuance of the remittitur, the trial court is to calculate the amounts of benefits provided after the placement of the minor pursuant to an individualized education plan. As to the benefits provided after the placement of a minor pursuant to an individualized education plan, those are to be deducted from the $6,944 imposed after the trial in this case. The trial court is then to enter a new reimbursement order for the remaining sums incurred prior to the placement pursuant to the individualized education plan. Nothing in this opinion is to be construed as a statement of views

as to the amount that should be imposed. Moreover, as to any future benefits provided by the Temporary Assistance to Needy Families program to the minor, a reimbursement duty could quite reasonably arise if the minor is not subject to a placement pursuant to an individualized education plan. It bears emphasis that this opinion does not address the issue of future reimbursement obligations if the minor is not subject to an individualized education plan.

### D. _ *Remaining Contentions**

. . . . . . . . . . . . . . . . . . . . . . . . . .

### V.   DISPOSITION

The judgment is affirmed as to the determination no reimbursement is owed for future costs incurred by the County of Los Angeles under the Temporary Assistance to Needy Families program so as long as the minor is being cared for under an individualized education plan. The reimbursement order is reversed and remanded for further proceedings as discussed in the body of this opinion. Defendant, Joanne Smith, shall recover her costs on appeal from the County of Los Angeles.

Grignon, J., and Godoy Perez, J., concurred.

---

*See footnote, *ante*, page 500.