**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE MARIA G. RIVERA,

*Debtor*,

MARIA G. RIVERA,

*Appellant*,

v.

ORANGE COUNTY PROBATION
DEPARTMENT,

*Appellee.*

No. 14-60044

BAP No.
13-1476

OPINION

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Kirscher, Pappas, and Latham, Bankruptcy Judges,
Presiding

Argued and Submitted June 6, 2016
Pasadena, California

Filed August 10, 2016

Before: Stephen Reinhardt, and Kim McLane Wardlaw,
Circuit Judges, and Mark W. Bennett,* District Judge.

Opinion by Judge Reinhardt

---

*The Honorable Mark W. Bennett, United States District Judge for the
Northern District of Iowa, sitting by designation.

## SUMMARY**

### Bankruptcy

The panel reversed the judgment of the Bankruptcy Appellate Panel, which had affirmed the bankruptcy court's denial of a debtor's motion to sanction Orange County for persisting post-discharge in its efforts to collect a debt arising from the debtor's son's involuntary juvenile detention.

The panel held that the debtor's liability for the costs of support of her son while in detention was not a "domestic support obligation" and thus was not excepted from discharge in bankruptcy under 11 U.S.C. § 523(a)(5).

### COUNSEL

Brett H. Ramsaur (argued) and Todd E. Lundell, Snell & Wilmer, Costa Mesa, California, for Appellant.

Adam C. Clanton (argued), Deputy; Laurie A. Shade, Senior Deputy; Nicholas S. Chrisos, County Counsel; Orange County Counsel, Santa Ana, California; for Appellee.

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## OPINION

REINHARDT, Circuit Judge:

### INTRODUCTION

We must decide whether a mother's debt to Orange County arising from her son's involuntary juvenile detention is a "domestic support obligation" and thus excepted from discharge in bankruptcy. We conclude that it is not.

### FACTUAL BACKGROUND

Appellant Maria Rivera is the mother of a minor who was held in juvenile detention in Orange County for more than a year, from 2008–2010. Upon her son's release, the County Probation Department sent Rivera a bill.

California law makes the parents of juvenile detainees "liable for the reasonable costs of support of the minor while the minor is" held in detention. Cal. Welf. & Inst. Code § 903(a). A county may seek reimbursement under § 903 only "for food and food preparation, clothing, personal supplies, and medical expenses," *id.*, and the statute imposes a cap of $30 per day. § 903(c). Within those constraints, the statute limits the bill to the parents' "ability to pay" at the time the debt is imposed. *Id*.

As a result, Rivera's bill did not cover the entire cost to the County of her son's detention, but it was a large sum nevertheless. The County sought to recover $23.90 from Rivera for each day her son was detained, and $2,199 for legal expenses. The total bill came to $16,372.

Rivera did her best to pay. After selling her house, she paid $9,508 on May 10, 2010. Part of the debt remained, however, and the County continued sending Rivera regular bills. Eventually, she was served with an order to appear before the juvenile court, and when she failed to do so, the court entered a default judgment against her. The judgment stated that she still owed the County $9,905, despite her earlier payment.[1]

Several months later, in September 2011, Rivera filed for bankruptcy under Chapter 7 of the Bankruptcy Code. She had no assets to distribute, only debts to discharge. In January 2012, Rivera received a full discharge and, thus, the "fresh start" that the protections of the Bankruptcy Code seek to provide. *Harris v. Viegelahn*, 135 S. Ct. 1829, 1835 (2015).

Orange County, however, persisted in its efforts to collect Rivera's debt even after the conclusion of her bankruptcy case. The County believed that Rivera's debt was a "domestic support obligation" ("DSO") like alimony or child support – the kind of debt that is not dischargable in bankruptcy under 11 U.S.C. § 523(a)(5).

Rivera believed that any remaining debt to the County had been fully discharged. In her bankruptcy petition, she had listed her unpaid obligation to the County as a priority

---

[1] The County's accounting in this case is highly questionable. It is unclear how this amount was reached. Rivera's son's expenses totaled $16,372. After Rivera's payment on May 10, 2010, this would leave at most $6,864. In addition, the child's father negotiated with the County to pay $3,336. If the father paid the full amount he promised, only $3,528 would appear to remain. At Oral Argument, County counsel was unable to explain this apparent discrepancy.

unsecured debt, not a DSO, and the County did not object in writing to this characterization.  Rivera moved to reopen her bankruptcy case and asked the bankruptcy court to sanction the County for attempting to collect a discharged debt.  The court reopened the case, and issued a tentative ruling in Rivera's favor.

After further briefing, however, the bankruptcy judge changed his mind and ruled in favor of the County.  The judge was persuaded that Congress expanded the category of DSOs in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA) to include Rivera's debt.  The judge agreed with the County that Rivera's debt was in the nature of support because the County sought to recover only the costs of her son's food, clothing, and medicine, not the full cost of his detention.  The Bankruptcy Appellate Panel affirmed on largely the same ground, and Rivera appealed.  Whether Rivera's debt to the County is a domestic support obligation is the issue before us.

## DISCUSSION

## I.

Bankruptcy gives people from all walks of life a "fresh start."  *Harris*, 135 S. Ct. at 1835.  "[A] debtor who successfully navigates the bankruptcy process is ordinarily entitled to a discharge of all pre-petition debts."  *In re Leibowitz*, 217 F.3d 799, 801 (9th Cir. 2000).  Some debts, however, are not eligible for discharge.  Among them are domestic support obligations – the financial obligations upon which family members and former family members rely.  Section 523(a)(5) of the Bankruptcy Code excepts DSOs from discharge.  The purpose of this exception is to ensure

that spouses and children continue to receive support even if the support provider has declared bankruptcy. *See In re Chang*, 163 F.3d 1138, 1140 (9th Cir. 1998). The exception to discharge for DSOs thus "strikes a balance between competing policies." *Id*. On the one hand, bankruptcy permits a petitioner to wipe his slate clean when debts become impossible to overcome. "On the other hand, this court has recognized an overriding public policy favoring the enforcement of familial obligations." *Id*. Bankruptcy provides a way to leave one's debts, but not one's most fundamental family obligations, behind.

Before 2005, the Bankruptcy Code provided that a debt was a DSO and thus excepted from discharge if it was owed "to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement. . . ." 11 U.S.C. § 523(a)(5) (pre-2005). The definition also provided for several exceptions.

Under this definition, it was clear that ordinary family support obligations owed directly to a child or former spouse were DSOs. Courts divided, however, on the DSO status of debts owed to government agencies concerned with family support. *Compare, e.g.*, *City of Oakland v. Fralick*, 215 B.R. 132, 133 (W.D. Mich. 1997) (foster care debt is not a DSO because it is "owed to an entity other than a child, spouse or ex-spouse"); *with In re Burton*, 132 B.R. 575 (Bankr. N.D. Ind. 1988) (foster care debt is a DSO because it is in the nature of familial support). *Compare also, e.g.*, *In re Spencer*, 182 B.R. 263 (Bankr. E.D. Cal. 1995) (a debt owed

to a state wardship unit is not a DSO because it is owed to a government unit); *with In re Canganelli*, 132 B.R. 369 (Bankr. N.D. Ind. 1991) (wardship debt is a DSO because it is in the nature of domestic support). *Compare also, e.g.*, *In re Linn*, 38 B.R. 762, 762 (9th Cir. B.A.P. 1984) (debt arising from a "court appointed attorney and psychiatrist for [a] minor child" in a custody proceeding is not a DSO because it is owed to a government entity); *with Chang*, 163 F.3d at 1141 (debt arising from a court appointed guardian ad litem and neutral mental health expert in a custody proceeding is a DSO because it is in the nature of child support).

BAPCPA, the statute that modified the Bankruptcy Code in 2005, resolved the dispute. Following the 2005 amendment, a debt does not lose its DSO status simply because it is owed to a governmental unit. The statute now states that a debt is a DSO if it is "owed to or recoverable by. . . a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative" or "*a governmental unit*" and is "in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated." 11 U.S.C. § 101(14A) (emphasis added). This definition does not change the substance or core meaning of the term DSO. It did, however, remove any doubt that debts owed to various government units for temporary child or spousal aid payments; for support provided in foster care, wardship, and residential treatment centers; or for expenses incurred for a child's benefit in

divorce and custody proceedings could qualify as DSOs.[2] Thus, BAPCPA carries forward the core purpose of the DSO exception by ensuring that bankruptcy will not hinder the enforcement of family obligations in circumstances in which the government's family support infrastructure – the network of foster systems, aid agencies, family courts, and the like – has intervened on a spouse's, former spouse's, or child's behalf.

The question before us, however, is whether debts owed to government units that are not part of the government's family support infrastructure, and specifically debts to a Probation Department for costs related to a juvenile's detention, are "in the nature of . . . support," and thus are DSOs. The answer to this question is the same after BAPCPA as it was before, as BAPCPA changed only the parties who could qualify as creditors to whom a DSO was owed, not the definition or nature of family support itself.

## II.

Rivera owes her debt to the Orange County Probation Department – a law enforcement unit. The Department's mission statement describes it as a "public safety agency" that makes use of "efficient and research supported corrections practices to Reduce Crime[,] Assist the Courts in Managing Offenders[,] Promote Lawful and Productive Lifestyles[, and]

---

[2] This was already the general approach we preferred in this Circuit before the BAPCPA amendments. *See Chang*, 163 F.3d at 1141 (explaining that the "identity of the payee is less important than the nature of the debt"); *Leibowitz*, 217 F.3d at 803 (adopting the same approach and explaining that the key question is whether the debt is "in the nature of support"). Thus BAPCPA resolved the dispute in favor of this Circuit's approach.

Assist Victims."**3**    The "support" that the Probation Department provided to Rivera's son in the course of his detention was incidental to – and the price of – its larger governmental purpose of promoting "public safety" and "reduc[ing] crime" through "corrections practices."  In short, the purpose of Rivera's son's detention was to enforce the criminal law.

This sets Rivera's case apart from all other cases in which debts have been found to be covered by the statutory definition of DSOs.  The purpose of foster care and state wardship, for example, is to provide for a minor's safety, well-being, and support.  Foster systems and wardship units are a part of the state's child support infrastructure, not its criminal justice system.  This infrastructure is concerned with child welfare, not the protection of society, and its institutions assume custody over a minor because of problems with his family home life or the absence of his parents; they seek to reproduce for the child the kind of holistic support that parents ordinarily provide.**4**  They are designed, in short, to improve the child's "domestic" circumstances.  Accordingly, many courts have found that foster care and wardship debts are in the nature of support within the meaning of the

---

**3** Orange County Probation Department, *Mission Statement*, http://ocgov.com/gov/probation/about/mission (last visited Aug. 3, 2016).

**4** Moreover, a noncustodial parent's obligation to help bear a child's costs in foster care is similar to a typical domestic support obligation, in which a noncustodial parent must support a child's welfare in a different home. *See In re Hernandez*, 496 B.R. 553 (8th Cir. B.A.P. 2013) (finding that a debt owed by an estranged mother to the state to assist foster parents who began to care for the child after the death of the father was in the nature of support).  As a result, a foster care debt is not materially different from an ordinary child support debt.

bankruptcy statute. *See, e.g.*, *Canganelli*, 132 B.R. at 394–95; *Burton*, 132 B.R. at 584; *In re Huber*, 80 B.R. 531 (Bankr. D. Colo. 1987); *In re Carlson*, 176 B.R. 890, 894 (Bankr. D. Minn. 1995).

In another line of cases, we identified debts to government units or related third parties as in the nature of support where those debts were inherently intertwined with the establishment of child support obligations. In *In re Leibowitz*, we considered the case of a mother who left her husband and applied for temporary financial support from a County aid program. 217 F.3d at 801. A condition of the County's support was that if she later won a child support order from her ex-husband, any benefits accrued during her enrollment in the aid program would be credited back to the County. Eventually, the court ordered the ex-husband to make monthly support payments and also to reimburse the County for its support of the mother after the separation but before the entry of the order. The question we confronted was whether the portion of the father's child support order owed directly to the County was in the nature of support. Similarly, in *In re Chang*, we considered whether the debt arising from the cost of a court-appointed guardian ad litem and neutral mental health expert in the course of custody proceedings was in the nature of support. 163 F.3d at 1138.

In both cases, we decided that the debt was indeed in the nature of support and thus excepted from discharge. *Chang*, 163 F.3d at 1141; *Leibowitz*, 217 F.3d at 803. The special feature of *Chang* and *Leibowitz* is that the debts arose in the course of custody and divorce proceedings – proceedings that are integral to the creation of domestic support obligations – and represented costs incurred to ensure the domestic welfare of the child. The debts were also owed, as in the case of

foster care and wardship, to government units or actors for which child support was the primary concern – to units that were a part of the state's family support infrastructure.

Rivera's debt is different. It arises from her son's involuntary detention for law enforcement purposes by a "public safety agency," and the provision of food and clothing is only incidental to such incarceration. Rivera's son was taken into custody not in order to provide a place where he could secure a wholesome upbringing but because of his criminal misbehavior; he was placed and remained in a detention facility because of the state's interest in enforcing the law, not because of its interest in giving him a nourishing home, affording him sustenance, ensuring his safety, or providing him with an improved domestic environment. As the Supreme Court explained, a state's duty to provide basic needs to an incarcerated person "arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *DeShaney v. Winnebago Cty. Dept. of Social Servs*, 489 U.S. 189, 200 (1989). Moreover, Rivera's debt is not inherently intertwined with the establishment of child support obligations. To the contrary: it comes not in the course of a child custody hearing but in the wake of a criminal proceeding that results in involuntary detention.

It is therefore both inaccurate and inconsistent with precedent to characterize Rivera's debt to the County as "in the nature of . . . support" as that term is defined in the Bankruptcy Code. *See* 11 U.S.C. § 101(14A). Unlike foster care or wardship units, which seek to recreate a domestic environment for children without a suitable home, and unlike guardians and experts who are appointed on a child's behalf

in family disputes in order to help protect a child's domestic welfare, juvenile detention serves not domestic but correctional ends. In short, Rivera's debt is not a domestic support obligation and thus not excepted from discharge.

This conclusion is in harmony with the cases that have directly addressed parents' debts arising from a child's correctional detention. The one other bankruptcy court to consider the dischargeability of parents' juvenile detention debts post-BAPCPA held that the debt "is not in the nature of support," reasoning that "an involuntary detention in a juvenile facility hardly seems to fit within the purpose and spirit of the statute." *In re Rosen*, No. 11-07651-BHL-7, 2012 WL 1565617, at *2 (Bankr. S.D. Ind. May 2, 2012). The few pre-BAPCPA decisions dealing with such debts concluded that they were not DSOs, but did not directly address the question of whether the debt was in the nature of support and instead based their holdings on the fact that the debt was owed directly to a government unit. *See In re Erfourth*, 126 B.R. 736, 741 (Bankr. W.D. Mich. 1991); *In re Crouch*, 199 B.R. 690, 693 (9th Cir. B.A.P. 1996). The Seventh Circuit followed the same approach in holding a parent's debt in connection with a juvenile delinquent's custody dischargeable in *In re Platter* but tellingly observed that "the ultimate purpose" of the debt "is not to provide the debtor's child with support; it is to provide the [County] with reimbursement for its efforts." 140 F.3d 676, 683 (7th Cir. 1998). That observation is equally pertinent here. Significantly, no court has previously held that a parent's debt resulting from a child's juvenile detention is excepted from discharge or that it constitutes a DSO.

### III.

The conclusion that Rivera's debt is not a domestic support obligation as defined in 11 U.S.C. § 101(14A), and thus not excepted from discharge in bankruptcy, vindicates the purposes of the Bankruptcy Code and its discharge exceptions.

"The principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor." *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007). "Congress normally confines [exceptions to discharge] to circumstances where strong, special policy considerations, such as the presence of fault, argue for preserving the debt." *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1760 (2013). The exceptions to discharge that the Code spells out (including the exception for DSOs) are to be construed narrowly so as to make a fresh start possible unless Congress has clearly created an exception. *Id*.

There can be no doubt that Rivera is an "unfortunate but honest debtor." *Marrama*, 549 U.S. at 367. She incurred her debt through no fault of her own. In fact, she incurred it as a result of *somebody else*'s fault. It was her son's actions, not hers, that led to his detention in juvenile hall, and thus his actions, not hers, that enabled the County to burden her with this debt under § 903. Nevertheless, in the wake of her child's incarceration – "[o]ne of the greatest misfortunes a parent may suffer," *In re Jerald C.*, 36 Cal. 3d 1, 10 (1984) – Rivera made a good faith effort to pay her bill. She has paid over half of it already, at great personal sacrifice. Rivera's debt thus arises in precisely the circumstance in which the Bankruptcy Code seeks to provide a fresh start.

The specific exception to discharge for DSOs is designed to ensure the continued "enforcement of familial obligations" even through bankruptcy proceedings. *Chang*, 163 F.3d at 1140. While bankruptcy provides a fresh start for almost everything, it does not permit debtors to abandon their financial obligations to their children, spouses, former spouses, and other beneficiaries who rely on domestic support or to government units that help administer or enforce such support.

Here, however, a conclusion that Rivera's debt is excepted from discharge would not benefit her son but, as the Seventh Circuit pointed out, would only detract from her ability to fulfill her family support obligations. *See Platter*, 140 F.3d at 683 ("Excluding this debt from discharge . . . will neither protect spouses, former spouses, or children from being injured by a debtor's discharge nor will it further the bankruptcy goal of a fresh start for the debtor."); *see also Crouch*, 199 B.R. at 693 (explaining that "[a] finding that the debt in question here is nondischargeable. . . would not further the statutory policy of protecting family support obligations" but instead "would detract from the fresh start policy embodied in § 523(a)(5)"). While the discharge of a typical DSO harms the beneficiaries of domestic support by depriving them of that support – hence the Bankruptcy Code's exception – the discharge of Rivera's debt will almost certainly *benefit* her son, who has much to gain from his mother's fresh start. The only entity affected negatively by discharge in this case is the County, which will suffer only by losing the portion of its cost of incarceration that it seeks so adamantly to recover, surely not a loss that is inconsistent with furthering the objectives of family support. To allow the County "to recover its debt without entering the creditors' queue is counter to the Bankruptcy Code's general purpose

and [the discharge exception's] specific purpose." *Platter*, 140 F.3d at 683.

## IV.

The County's arguments that Rivera's debt is excepted from discharge are unpersuasive. Contrary to the County's assertion, Rivera's debt is not in the nature of domestic support simply because it represents in part the costs of her son's basic needs. There is no doubt that the County "supported" Rivera's son during his detention, and that the expenses for which the County seeks reimbursement fall under the general rubric of support; but that is not sufficient to make an obligation a DSO.[5] A credit card company could hardly claim that a credit card debt is "in the nature of . . . support" as contemplated by § 101(14A) because the underlying charge was for food, medicine, and clothing for a dependent child. Nor could a retailer or a hotelier claim that an unpaid bill creates a debt "in the nature of . . . support" because that bill represents the cost of a minor's basic needs. Rivera's debt is not in the nature of support for the purposes of the Bankruptcy Code simply because the underlying expenses for which the County seeks reimbursement can be described ordinarily as support expenses. Where the principal purpose of the County's custody over Rivera's son is public safety, not the son's domestic well-being or welfare, the debt does not qualify as a domestic support obligation.

---

[5] The same is as true of room as of board. Indeed, under the County's theory, it could except almost the entire cost of incarceration from discharge, should state law permit it to send a more expansive bill. Similarly, under that approach, the cost of a juvenile's incarceration in an adult prison could be excepted from discharge if a state sought to charge his parents for such imprisonment.

For the same reason, Rivera's debt is not in the nature of support simply because state law limits the expenses for which the County may legally seek reimbursement to certain specific aspects of its total expenditure. We have said that the way a state characterizes a debt is relevant, though not conclusive, to its proper classification in bankruptcy, *see Chang*, 163 F.3d at 1140, but the County draws the wrong conclusion from the history of California Welfare and Institutions Code § 903.

A previous version of the statute permitted counties to bill parents for the full costs of their children's detention. The California Supreme Court found that version unconstitutional, explaining that it is unacceptable to bill parents for the costs of protecting society against the misdeeds of their children. *Jerald C.*, 36 Cal. 3d at 10–11. The Court then upheld the present version, noting that it properly limits the debt to "the reasonable costs expended for the support and maintenance of the minor." *Cty. of San Mateo v. Dell J.*, 46 Cal. 3d 1236, 1250 (1988).

While providing an explanation as to why state law limits the expenses for which a County may seek reimbursement to the costs of the minor's basic needs, the legislative action does not, contrary to the County's argument, support the conclusion that state law characterizes Rivera's debt as in the nature of support for the purposes of federal bankruptcy law; nor does it show that the purposes of the DSO exemption would be served by holding that such claims fall within the statutory definition of that exception. At least as important, the statute explicitly states that its purpose is to "protect the fiscal integrity of the county. . .," Cal. Welf. & Inst. Code § 903(c), and at oral argument the County's counsel stated that the motivation for seeking to collect from Rivera was

indeed financial. The special federal policy excepting domestic support obligations from discharge in bankruptcy does not extend to the reimbursement of an obligation assessed not to support a child or to help operate a government department principally dedicated to the welfare of children, but rather to protect the fiscal integrity of a county's juvenile detention system.

Finally, the county is wrong in arguing that BAPCPA expanded the nature of the support that qualifies for reimbursement as a DSO. We agree that BAPCPA provides that debts to government units can now be DSOs and that "assistance provided by a government unit" – like foster care, residential treatment, or a court-appointed guardian – can sometimes fall into that category. *See* 11 U.S.C. § 101(14A)(B). BAPCPA, however, did not alter the purpose of the DSO discharge exception, nor did it change the fundamental requirement that DSOs be for the purposes of child or family support. *See In re Hickey*, 473 B.R. 361 (Bankr. D.Or. 2012) ("While § 523(a)(5) may have been amended by BAPCPA, the changes did not change the standard for whether a debt or obligation is in the nature of support."); *In re Phegley*, 443 B.R. 154, 157 (8th Cir. B.A.P. 2011) ("The BAPCPA amendments . . . did not change the standard for whether an obligation is in the nature of support."). In sum, BAPCPA amended the Bankruptcy Code's DSO exemption so as to expand its scope to cases in which "domestic support" is provided by a government agency but not so as to change the nature of domestic support itself.

### CONCLUSION

Orange County's persistence in collecting a debt of over $9,000 from a bankrupt woman who has acted in good faith in difficult circumstances has been nothing if not resolute. Rivera's case is troubling, however, because the County's actions compromise the goals of juvenile correction and the best interests of the child, and, ironically, impair the ability of his mother to provide him with future support. Burdening a minor's mother with debts to be paid following his detention – debts that she cannot escape even in bankruptcy – hardly serves the future welfare of the child and hardly enhances the Probation Department's attempt to transform him into a productive member of society. Most disturbing, however, is that the County's actions undermine the very domestic "support" for which it is ostensibly seeking reimbursement. In relentlessly pursuing the debt's collection and opposing its discharge, the County raises yet another obstacle to Rivera's efforts to provide her son with the support about which the County claims to be so deeply concerned. That "betray[s] a misguided sense of values." *Jerald C.*, 36 Cal. 3d at 10.

The County's actions also highlight a recurring problem of public entities imposing fiscal burdens on those who can least afford them. Orange County's public budget shows that the Probation Department relies on self-generated revenue for more than 40% of its financing.[6] Seeking to obtain that revenue by unremittingly pursuing legal actions against disadvantaged individuals – the counterproductive practice at

---

[6] *See FY 2016–17 Orange County Recommended Budget: Public Protection*, http://bos.ocgov.com/finance/2017WB/p1_frm.htm.

issue here – can have damaging effects on the community.[7] Not only does such a policy unfairly conscript the poorest members of society to bear the costs of public institutions, operating "as a regressive tax,"[8] but it takes advantage of people when they are at their most vulnerable, essentially imposing "a tax upon distress."[9] Moreover, experience shows that the practice undermines the credibility of government and the perceived integrity of the legal process.[10]

---

[7] The problem is not limited to probation costs. Raising money for government through law enforcement whatever the source – parking tickets, police-issued citations, court-imposed fees, bills for court appointed attorneys, punitive fines, incarceration charges, supervision fees, and more – can lay a debt trap for the poor. When a minor offense produces a debt, that debt, along with the attendant court appearances, can lead to loss of employment or shelter, compounding interest, yet more legal action, and an ever-expanding financial burden – a cycle as predictable and counterproductive as it is intractable. *See* ALICIA BANNON, MITALI NAGRECHA & REBEKAH DILLER, BRENNAN CENTER FOR JUSTICE, CRIMINAL JUSTICE DEBT: A BARRIER TO REENTRY 13–17 (2010), http://www.brennancenter.org/sites/default/files/legacy/Fees%20and%2 0Fines%20FINAL.pdf; Beth A. Colgan, *Paying for* Gideon, 99 IOWA L. REV. 1929 (2014).

[8] *Developments in the Law: Policing and Profit*, 128 HARV. L. REV. 1706, 1734 (2015); *see also* HUMAN RIGHTS WATCH, PROFITING FROM PROBATION (2014), http://www.hrw.org/sites/default/files/reports/us021 4_ForUpload_0.pdf.

[9] Jeremy Bentham, *A Protest Against Law-Taxes*, *in* 2 THE WORKS OF JEREMY BENTHAM 573 (John Bowring ed., 1843).

[10] *See, e.g*, U.S. Dep't of Justice, Civil Rights Div., *Investigation of the Ferguson Police Department* (March 4, 2015) at 79 n.54 (reporting that the revenue orientation of the Ferguson police, among other factors, has "generated great distrust of Ferguson law enforcement, especially among African Americans").

Section 903 permits the County to impose debts on the parents of children detained in juvenile hall, but it does not require it to do so. Like so much else, it is a matter of the County's discretion whether to send the parent a bill in the first place, and a matter of further discretion whether to persist in collecting the debt when that parent's circumstances change for the worse. We would hope that in the future the County will exercise its discretion in a way that protects the best interests of minors and the society they will join as adults, instead of following a directly opposite and harmful course.[11]

**\*\*\***

For the reasons discussed above, the judgment of the Bankruptcy Appellate Panel is **REVERSED**. Any further proceedings below shall be consistent with this opinion.

---

[11] Earlier this year, the Alameda County Board of Supervisors voted to end the collection of juvenile probation fees under § 903, noting that "it is in the interest of the County, of young people involved in the juvenile justice system and their families, and of the larger community that the County repeal the . . . juvenile probation fees." Alameda Cty. Bd. of Supervisors, Res. No. 2016-66 (Mar. 29, 2016), http://www.acgov.org/board/bos_calendar/documents/DocsAgendaReg _03_29_16/PUBLIC%20PROTECTION/Regular%20Calendar/Supervi sor%20Valle_Supervisor%20Carson_229888.pdf.